JOHN PAUL MITCHELL
SYSTEMS, Plaintiff,

v.

QUALITY KING DISTRIBUTORS,
INC. et al., Defendants.

No. 99 Civ. 9905 (SHS).

United States District Court,
S.D. New York.

June 8, 2000.

Geoffrey Potter, Kramer, Levin, Naftalis & Frankel L.L.P., for Plaintiff.

Robert J. Brener, Edwards and Angell, New York City, Stanley R. Goodman,

Goodman & Saperstein, Garden City, NY, for Defendants.

I. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 466
 A. The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 466
 B. The JPMS–CDM Relationship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 467
 C. The Diversion of Product by CDM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 468
 D. Quality King's Knowledge of the Diversion by CDM . . . . . . . . . . . . . . . . . . 468
 E. JPMS's Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 470
II. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 470
 A. Evidentiary Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 471
 B. Preliminary Injunction Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 473
 C. Irreparable Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 473
 D. Success on the Merits of the Claim for Tortious Interference with Contract . . . 475
 E. No Injunctive Relief for Claim of Replevin . . . . . . . . . . . . . . . . . . . . . . . . . . 477
III. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 478

*OPINION*

STEIN, District Judge.

John Paul Mitchell Systems ("JPMS" or "Paul Mitchell") seeks a preliminary injunction restraining the distributor Quality King Distributors, Inc. from selling $1.4 million of Paul Mitchell hair care products that traveled around the world before docking in Quality King's Long Island warehouse. JPMS sold those products for distribution in China, but they were diverted from their authorized market and sent back to the United States via Holland. Although the action involves multiple claims and defendants, JPMS seeks a preliminary injunction only against Quality King and only on two grounds: (1) tortious interference with contract and (2) replevin. JPMS seeks the injunction in order to prevent irreparable damage to its exclusive, salon only distribution policy. On the basis of the evidence adduced at an evidentiary hearing and for the reasons set forth below, the motion is denied.

## I. Background.

### A. The Parties.

JPMS, a California corporation, manufactures more than $100 million in Paul Mitchell hair and skin care products annually. It maintains a tight distribution network, contractually requiring its distributors to sell JPMS product only to professional hair salons. *See* Tr. 278.[1]

JPMS further requires that all salons buying its product sign a contract with the distributor agreeing not to divert those products for non-salon resale. It randomly inspects contracts to ensure that the 90,000 salons that carry Paul Mitchell products have signed such a contract. *See* Tr. 280.

Defendant Quality King Distributors, Inc., a New York corporation, is a wholesale distributor of a variety of consumer products, including health and beauty aids, designer fragrances, and pharmaceuticals. In 1999 it had revenues of $1.7 billion.

Paul Mitchell believes that Quality King purchased the $1.4 million worth of Paul Mitchell products knowing that they had been procured by fraud, and also believes that Quality King induced JPMS's Chinese distributor to breach its contract with JPMS.

The other defendants in this action are allegedly involved in a fraudulent scheme to induce JPMS to sell Paul Mitchell products to a Chinese corporation under the pretense that those products would be distributed to professional hair salons in China. These other defendants instead shipped the product back to the United States and allegedly sold them to Quality

---

1. References to "Tr. ___" are to pages of the transcript of the hearing dated March 9 & 13, 2000.

King. JPMS has not sought to preliminarily enjoin those defendants.

## B. The JPMS–CDM Relationship.

JPMS charges that the fraud began in 1996, when defendant Jerome Alexander approached John Paul DeJoria, CEO and Chairman of JPMS, and broached the idea of starting a Paul Mitchell distributorship in China. DeJoria testified that Alexander, whom DeJoria had known since 1971, claimed to understand JPMS's policy of selling only through professional hair care salons and that Alexander's previous business activities in China gave him a strong understanding of the Chinese market for beauty products. Alexander also promised DeJoria that he would invest at least $1,000,000 in the development of a Chinese distribution network. *See* Tr. 59. Around the same time, DeJoria had similar conversations with Alexander's son, Berin Alexander, and their partner, Robert Seibel, regarding JPMS's policy of distributing its products only to professional hair care salons. *See* Tr. 61.

Seibel and the Alexander's thus led JPMS to believe that they had extensive experience distributing products in China and that their company, China Distribution & Marketing, Ltd. ("CDM"), would build a distribution network and market for the Paul Mitchell line of products. Based upon these representations as well as his personal knowledge of Jerome Alexander, DeJoria entered into a contract on behalf of JPMS with CDM in December of 1996. *See* Tr. 60 & 62. The first contract, with a term beginning on January 1, 1997 and ending on June 30, 1998, explicitly limited sales of Paul Mitchell product by CDM to professional hair salons located in China and required CDM to engage in education and training of the hair salons chosen to sell the Paul Mitchell product. *See* Pl.Ex. 54, at 11, 16–21, & A.

In connection with the launch of Paul Mitchell products, DeJoria and JPMS hair artists and product development personnel visited China and witnessed what at the time they believed were the early stages of CDM's distribution efforts. The JPMS employees held well attended shows in Beijing and Shanghai, visited hair salons in those cities, and appeared on television and in newspapers—public events all organized by CDM. From JPMS's perspective, the introduction of Paul Mitchell products in China appeared to be proceeding successfully. *See* Tr. 64–65.

DeJoria first suspected diversion of its product in March of 1998, when JPMS discovered that retail outlets in the United States possessed several dozen bottles of the Paul Mitchell product that JPMS had sold to CDM. *See* Tr. 69 & 219. JPMS knew the Paul Mitchell bottles had been sent to CDM because it had secretly coded them—a common company practice. *See* Tr. 72–73. DeJoria immediately called Jerome Alexander, who claimed that approximately one thousand bottles had been stolen from the port of Shanghai in 1997 and that these bottles must have found their way back to the United States. *See* Tr. 69–70. Alexander's partner and CDM's lawyer, Robert Seibel, sent a letter to JPMS dated May 8, 1998 to the same effect. *See* Pl.Ex. 78. JPMS was suspicious about Alexander's explanation since it knew that some of the CDM product appearing in the United States had been sold to CDM in 1998, and therefor could not have been part of the putative 1997 theft. *See* Tr. 225. In addition, CDM never reported any theft to the Chinese police. *See* Pl.Ex. 78.

Lacking more definitive proof of diversion, on May 21, 1998, JPMS extended the CDM contract until December 31, 1998, *see* Pl.Ex. 97. The renewal contract—just as the initial contract—prohibited diversion by CDM of the Paul Mitchell product outside of China or to retailers other than professional hair salons. It did so by incorporating the JPMS International Distributor Policy Manual. *See* Tr. 77.

Throughout this period, JPMS was growing increasingly suspicious of the

CDM operation. As more Paul Mitchell products sold to CDM appeared in the United States, JPMS requested documentation demonstrating CDM's inventory and sales controls. As early as March of 1999, Luke Jacobellis, JPMS's Chief Operating Officer, concluded that CDM apparently had no controls in place. *See* Tr. 225. JPMS also began noticing that CDM's orders, inventory and sales reports did not match properly. *See* Tr. 238 & 240. As a result, JPMS asked private investigators to look into CDM. *See, e.g.,* Tr. 227 – 230.

JPMS subsequently refused to renew CDM's contract for 1999 unless the officers of CDM provided a $1,000,000 personal guaranty that CDM would not divert product. *See* Tr. 236. Because CDM's officers refused to give that guaranty, CDM's contract was not renewed. Nonetheless, JPMS shipped product to CDM in 1999 on an order-by-order basis. *See* Tr. 239.

In August of 1999, a JPMS employee traveled to China to review CDM's distribution network. Based on her resulting report, DeJoria concluded that Seibel and the Alexanders had defrauded JPMS. Shortly after, JPMS commenced this litigation.

On September 22, 1999, this Court issued a temporary restraining order enjoining the sale, transfer or marketing of any product originally bought by CDM to any person or entity besides a Chinese hair care salon. Quality King subsequently agreed to segregate and hold all Paul Mitchell products that it could identify as having been purchased from the middleman Niv Vigdor pending determination of plaintiff's motion for a preliminary injunction. Following discovery proceedings, an evidentiary hearing was held on plaintiff's motion on March 9 and 13, 2000.

### C. The Diversion of Product by CDM.

Discovery proceedings have uncovered evidence of CDM's actual activities during the contract period. Seibel and the Alex-

anders have invoked their Fifth Amendment rights against self-incrimination. Nonetheless, it is possible to tell what happened to the Paul Mitchell product purchased by CDM by examining the corporate documents which CDM and Quality King produced in discovery.

Beginning in 1997 JPMS began sending Paul Mitchell products to CDM in Shanghai. Unbeknownst to JPMS, CDM sold these products to a middleman named Niv Vigdor, a defendant who has not yet appeared in this action. Vigdor shipped those products to Rotterdam and from there to Quality King in Ronkonkoma, New York. This diversion of Paul Mitchell product—including a round trip to and from China—continued until JPMS stopped shipping goods to CDM in March of 1999.

The Quality King invoices, CDM documents and the actual product held in the Quality King warehouse indicate that Vigdor sold Quality King the same product that JPMS shipped to CDM. Luke Jacobellis, the JPMS chief operating officer, testified that after CDM's initial orders, JPMS secretly coded approximately 75% of the Paul Mitchell product, *see* Tr. 221, and product held by Quality King in its warehouse bore the special China code. JPMS sent 70 store keeping units (i.e., product types and sizes); the Quality King invoice demonstrated that the product purchased from Niv Vigdor included each of those 70 store keeping units and no others. *See* Tr. 183. In total, JPMS manufactures 130 store keeping units. Similarly, JPMS shipped 927,876 Paul Mitchell items to CDM; Quality King purchased 922, 624 Paul Mitchell items, a shortfall of only 5,252 items. *See* Tr. 184.

### D. Quality King's Knowledge of the Diversion by CDM.

It is unlikely that JPMS will be able to prove that Quality King had specific knowledge of this diversion prior to the filing of this case. Glenn Nussdorf, the

CEO of Quality King, testified that prior to this litigation he had never heard of CDM or defendants Jerome or Berin Alexander or Robert Seibel. *See* Tr. 373. In fact, Nussdorf had no knowledge of any Paul Mitchell activities in China. *See* Tr. 374. Marcie Blick, the Quality King employee responsible for the hair care division of Quality King, also testified that she had no knowledge of CDM, Robert Seibel or the Alexanders prior to this litigation. *See* Tr. 440–442. Blick testified that she did not know whether JPMS had contracts with all of its distributors and that she had no reason to believe that it did. *See* Tr. 442. She testified that she did not even know whether there were manufacturers who preferred that their products be sold in salons only. At most, she testified to a vague knowledge of litigation attempting to control the distribution of hair care products. *See* Tr. 443. Nussdorf further testified that he does not recall ever receiving letters from JPMS to Quality King regarding JPMS's distribution policy. *See* Tr. 374.

Quality King's claim of ignorance that JPMS distributes for end sale in salons only is highly suspect. Blick understood a number of practices whose only explanation could be the existence of an exclusive or restrictive distribution arrangement. Blick testified that Quality King has purchased Paul Mitchell products thousands of times from "collectors"—people who purchase products from a number of salons so that in the aggregate they have enough product to sell to non-salon retailers. *See* Tr. 435 & 472.

Blick also understood the reason distributors sometimes asked Quality King to remove batch codes from boxes of Paul Mitchell products: JPMS uses those codes to find wholesalers and salons who diverted products and to cancel its contracts with them. *See* Tr. 453. Although Quality King apparently did not remove any codes

from the boxes at issue here, the boxes—which have Chinese characters on them—had been slashed to remove the batch codes prior to their arrival at Quality King's warehouse. Nussdorf testified that middlemen who want to hide their suppliers would normally remove batch codes or names from shipment boxes. *See* Tr. 432–33.

Blick had even been directly told about the salon-only sales policy. She had been told that JPMS has contracts with its distributors to sell Paul Mitchell products only to professional hair care salons, *see* Tr. 466, and that those contracts prohibited diversion as long as five years ago, *see id.*

JPMS alleges that it directly notified Quality King of its distributorship policy. In September of 1998, JPMS provided a standard form of its international distributorship contract in a deposition in previous litigation. Although Quality King was not a party to that litigation, it did control the defense and appoint the lawyers for the defendants pursuant to an indemnification agreement it had with the defendants. *See* Tr. 473–74. Attorneys for JPMS had also mailed notification of its distributorship agreements to Quality King starting in 1993, 1994 and 1995. *See* Tr. 277. Those letters were sent before JPMS's contract with CDM was signed and the standard international distributorship agreement had changed over the years. *See* Tr. 295.

Nonetheless, the way that Quality King purchased the products at issue does appear to support the view that Quality King did not know about the specific diversion at issue here. In 1997,[2] Vigdor approached Nussdorf and said that he had Paul Mitchell product available. *See* Tr. 383–84. The offer came in the context of a 17 year relationship between Quality King and Vigdor, during which they had done

---

**2.** Although the transcript reads "1987," the surrounding testimony makes it manifest that the date was "1997."

more than $100 million in transactions with each other. *See* Tr. 375–76. During those 17 years, Quality King has had only one other problem (apart from this case) with a purchase from Vigdor. *See* Tr. 381.

At the 1997 meeting, Nussdorf and Vigdor negotiated a purchase price; Nussdorf then handed the negotiations over to Marcie Blick of Quality King. *See* Tr. 384–385. Blick talked with Vigdor about buying products from a number of manufacturers, including JPMS, and gave him a list of products that Quality King would be interested in buying. *See* Tr. 446.

Neither Nussdorf nor Blick asked Vigdor who his supplier was. *See* Tr. 385 & 445. They both explained that a middleman such as Vigdor will not identify his suppliers, since that would allow his buyers to cut him—the middleman—out of future transactions. *See id.* Vigdor merely told Quality King that it was to take possession of the product in Europe. *See* Tr. 387. Quality King utilized a company called EuroFactors International to inspect, purchase and transport the Paul Mitchell products to the United States. *See* Tr. 388. For reasons that are unclear, Quality King shipped the product to the United States under another name. *See* Tr. 390–91.

### E. JPMS's Damages.

During the preliminary injunction hearing, JPMS offered evidence of the damages it suffered as a result of the CDM diversion. JPMS sold its products to CDM at the same 20% discount it gave to all of its international distributors. *See* Tr. 184. The discount accounts for the fact that international distributors, unlike their domestic counterparts, must pay their own freight, as well as sponsor educational and marketing activities in the foreign country. JPMS intends for the international distributors to use the amount saved on the discount to build a foreign market for Paul Mitchell products. *See* Tr. 215. Other injuries include the cost incurred when JPMS sent its employ-

ees, including DeJoria, to help CDM begin its China operation.

Beyond the specific losses associated with this contract, diversion as a whole costs JPMS money. JPMS spent approximately $1.8 million fighting diversion in 1999, a figure that includes the purchase of $100,000 worth of Paul Mitchell products from non-salon retailers in 1999 in an effort to keep diverted product out of the marketplace. *See* Tr. 201. Several JPMS employees, earning combined salaries of $140,000 in 1999, dedicate virtually all of their time to fighting diversion. *See id.* JPMS also spent $905,000 in 1999 on outside counsel and investigators for the purpose of fighting diversion, including bringing litigation. *See* Tr. 201 & 283.

JPMS contends that the appearance of the large quantity of the China-bound Paul Mitchell products in U.S. retail stores will do further, irreparable harm to its domestic distribution scheme. JPMS offered the testimony of four salon owners who carry Paul Mitchell products. Each salon owner expressed dissatisfaction with the fact that Paul Mitchell products could be found in non-salon retail locations near their salons. *See, e.g.,* Koch Dep., at 53; Jarvis Dep., at 80. The appearance of Paul Mitchell product in non-salon retailers led the salons to cut back on, or altogether eliminate, the sale of Paul Mitchell products in their salons. *See, e.g,* Koch Dep, at 98–99; Riggenbach Dep., at 25.

## II. Discussion.

This action is neither black nor white, but grey. Manufacturers of such consumer products as Paul Mitchell hair care products attempt to assert control over what their distributors do with their products. This has led to the emergence of grey markets where genuine product is sold outside of a manufacturer's approved outlets. Frequently the dispute involves facts similar to this case—the reimportation of legitimate product that the manu-

facturer intended to be sold in a foreign market.

In this case, JPMS seeks to utilize doctrines from the common law tradition—tortious interference with contract and replevin—as mechanisms for blocking parties bound by no contract from distributing its products in the grey market. At least on the facts adduced to date, a preliminary injunction should not issue: JPMS has not shown irreparable injury, the likelihood of success on the merits of its tortious interference claim, or that its replevin claim entitles it to injunctive relief.

## A. Evidentiary Issues.

At the outset, two evidentiary issues need resolution. First, JPMS seeks to introduce into evidence the Fifth Amendment invocations by defendants Robert Seibel, Jerome Alexander, and Berin Alexander during their depositions. JPMS contends that these permit an inference that those defendants defrauded it. Quality King challenges the admissibility of the depositions, asserting that an adverse inference may not be drawn against a party other than the one invoking the Fifth Amendment. Alternatively, Quality King urges that no adverse inference may be drawn since, Quality King contends, JPMS has proffered no evidence of a fraud except for the Fifth Amendment invocations.

■■■ Quality King's first claim—that no adverse inference may be drawn against a party by another party's invocation of the Fifth Amendment privilege—is incorrect. Depending on the circumstances of a case, a non-party's invocation of the Fifth Amendment may be used to draw adverse inferences against a party in a civil case. *See LiButti v. United States,* 107 F.3d 110, 121 (2d Cir.1997). When deciding whether such an inference is warranted, the district court should consider a variety of factors, including (1) the nature of the relationship between the party and the non-party, (2) the degree to which the party controls the non-party, (3) the compatibility of the interests of the party and

non-party in the outcome of the litigation, and (4) the role of the non-party witness in the litigation. *See* 107 F.3d at 123. "[T]he overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." 107 F.3d at 124. Even where the issue is the use of one party's invocation against another party, the reliability of the adverse interest is the touchstone of the analysis.

■■ In this case, a fact finder could reasonably draw the inference that Seibel and the Alexanders invoked their Fifth Amendment privilege because they did in fact defraud JPMS. The reliability of that inference does not change because the potential finding of fraud would be to the detriment of Quality King. Insofar as the case involves proving the existence of a fraud, the interests of Quality King and the other defendants are aligned. Thus, the Fifth Amendment invocations are admitted for the purposes of determining this motion for a preliminary injunction.

Quality King's second argument—that no adverse inference can be drawn because there is no supporting evidence of fraud—is also rejected. JPMS has offered additional evidence of the fraud as set forth above.

The second evidentiary issue concerns JPMS's attempt to introduce into evidence two sets of documents which purport to be corporate records of CDM. The first set of documents were produced by defendant Robert Seibel as the custodian of CDM's corporate records in response to JPMS's subpoena. Seibel has invoked his Fifth Amendment privilege not to testify and so did not authenticate them at trial. The second set of documents were provided to JPMS by a former CDM employee in China who JPMS paid to give it incriminating information.

■■■ Quality King has objected to the admission of both sets of documents on the grounds that JPMS has not properly au-

thenticated them. Rule 901(a) of the Federal Rules of Evidence provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The rule is flexible, however, about what serves to authenticate a document. Direct testimony by a knowledgeable witness certainly satisfies the rule. *See* Fed.R.Evid. 901(b)(1). A party could also satisfy the authentication requirement if the document's form and content, taken with other circumstances, indicate that the document is reliable. *See* Fed.R.Evid. 901(b)(4).

For the reasons set forth below, the documents produced by Seibel are admitted, but at least for purposes of this preliminary injunction, the set of documents procured by JPMS from the paid informant is excluded.

 First, the Court admits the documents produced by CDM's corporate custodian in response to JPMS's subpoena.[3] The Court finds that these documents are authentic based upon two factors: the act of production by CDM's corporate representative and the documents themselves. Testimony is not the sine qua non of authentication; circumstantial evidence may serve to demonstrate a document's authenticity. *See United States v. Bagaric*, 706 F.2d 42, 67 (2d Cir.1983); *United States v. Holmquist*, 36 F.3d 154, 167 (1st Cir.1994); *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1423 (10th Cir.1991) Such circumstantial evidence can include a document's appearance and content. *See Bagaric*, 706 F.2d at 67. All four exhibits appear to be shipping records and invoices, appearing on corporate letterhead of various companies and listing product quantities and invoice amounts.

Moreover, the act of production implicitly authenticated the documents. "Just as [the defendant] could have identified the records by oral testimony, his very act of

production was implicit authentication." *United States v. Brown*, 688 F.2d 1112, 1116 (7th Cir.1982). The U.S. Supreme Court has noted, for example, that a taxpayer's production of papers demanded can indicate "the taxpayer's belief that the papers are those described in the subpoena." *Fisher v. United States*, 425 U.S. 391, 412–413, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). The Supreme Court has also written that the fact that production would relieve the government of the need to authenticate documents also establishes a valid claim of privilege against self-incrimination. *See United States v. Doe*, 465 U.S. 605, 614 n. 13, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984). For this reason, a defendant may resist producing subpoenaed documents where the implicit authentication amounts to testimony that the defendant "owns or at least possesses the documents." *See United States v. Fox*, 721 F.2d 32, 38 (2d Cir.1983). There is no dispute that these documents were produced by Robert Seibel, CDM's custodian of records, in response to a request for CDM's documents. Had he testified, Seibel would be able to authenticate the corporate records. Despite Seibel's invocation of his Fifth Amendment right, he has implicitly authenticated these documents by his act of production as records maintained by CDM concerning the shipment of Paul Mitchell products. Give the circumstances of production and the documents themselves, this Court finds that the documents marked as Plt.Ex. 128 to 131 have been authenticated.

 Thus authenticated, the documents are admissible as business records of CDM or, in the alternative, pursuant to the residual hearsay exception. *See* Fed. R.Evid. 803(6) & 807. The act of production indicates Robert Seibel's belief that the documents record the shipment of the Paul Mitchell products to Europe and that the documents were maintained in the ordinary course of CDM's business.

---

**3.** Those documents are plaintiff's exhibits 128 – 131.

■ A district court may admit hearsay documents pursuant to Fed.R.Evid. 807 where (i) the hearsay is particularly trustworthy, (ii) the hearsay bears on a material fact, (iii) the hearsay is the most probative evidence addressing the fact, (iv) the proffer follows adequate notice to the adverse party, and (v) the admission is consistent with the rules of evidence and advances the interests of justice. *See United States v. Bryce,* 208 F.3d 346, 350 (2d Cir.1999).

■ Each of these conditions is addressed in turn. The trustworthiness of these documents is established by their appearance and the fact that they were produced by Robert Seibel against his interests in the litigation. The issue of whether the Paul Mitchell product was sold and shipped to Quality King is material to the litigation, and the documents are probative of the fact that CDM believed the products were shipped from its warehouse in China to Rotterdam. Due to the Fifth Amendment invocation of several defendants and the apparent refusal of foreign non-parties to participate in the litigation, these documents are the most probative evidence available of the route the goods followed. Quality King has had sufficient warning of the intended proffer, as demonstrated by its motion in limine to exclude the documents. In the final analysis, it is in the interests of justice to admit these documents.

■ The second set of CDM documents—produced by JPMS's paid informant—are excluded due to lack of authentication. At least for the purposes of this preliminary injunction hearing, JPMS has offered inadequate evidence of how these documents were obtained. Several of the documents appear to bear the letterhead of CDM and Robert Seibel's law firm. Several also bear the signatures of certain of the defendants invoking the Fifth Amendment privilege. Still, the Court has been given no letterhead to compare with these documents. Most importantly, the paid informant never testified to their authenticity. Adequate proof of the authenticity of this set of documents, marked for identification as Plt.Exs. 132 to 140, has not been offered as of this date and those documents are therefore not admitted into evidence.

### B. Preliminary Injunction Standard.

■ This Court will grant a preliminary injunction only if JPMS has demonstrated that it will suffer "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

### C. Irreparable Harm.

■ No preliminary injunction will issue absent a showing that the party seeking the injunction would otherwise suffer irreparable injury; that is, that money damages cannot fully compensate for its expected injury. *See Jackson Dairy,* 596 F.2d at 72. JPMS has asserted several types of injury, but only one might constitute irreparable harm preventable by the issuance of a preliminary injunction: the damage to JPMS's relationship with professional hair care salons. Ultimately, JPMS has not shown that this damage would constitute irreparable injury in this action.

JPMS has developed a marketing and educational strategy which is dependent upon a close relationship with professional hair care salons. By guaranteeing that its products will only sell in salons, JPMS encourages salon owners to give prominent placement to Paul Mitchell products and to educate users on which Paul Mitchell products are most appropriate to their needs. This process requires the time of the hair care professionals to train with JPMS employees and to explain the Paul Mitchell

products to their customers and many of them will only expend that time if they can recoup a benefit by selling Paul Mitchell products to users throughout the year. If Paul Mitchell products can be bought outside of the salon, then customers will have the option of following the advice offered by salons but purchasing the products at possibly more convenient, non-salon locations.

JPMS has offered substantial evidence that the release of a large quantity of Paul Mitchell products to non-salon retailers will hurt this distribution scheme. In particular, the testimony of salon owners indicates that selected owners certainly believe in the importance of the exclusivity of the distribution network. As a result, if they see Paul Mitchell products sold in non-salon retailers, they stop carrying the product. The only expert testimony offered by JPMS was to the effect that Quality King was largely responsible for the diversion problem—not that JPMS would be harmed if its distribution scheme weakened or changed.

■ Thus, JPMS has shown that its current distribution scheme will further suffer damage if the Paul Mitchell product is sold in non-salon outlets. JPMS has not shown, however, that it will suffer pecuniary injury as a company if its current distribution scheme is replaced by the use of non-salon retail stores—or a combination of salons and non-salon retail outlets. JPMS offered no study or report regarding the benefits of the JPMS distribution scheme. There can be little doubt that JPMS believes in the value of the distribution scheme. The money spent on diversion detection and prevention aptly demonstrates this. Nonetheless, even a party's fervent belief that it will be damaged by another's action cannot replace evidence of that damage.

Indeed, courts have been suspicious of the claim that disruption of these exclusive distribution arrangements causes any pecuniary injury, let alone irreparable damage. The Second Circuit has rejected a tortious interference with contract claim on this basis, holding that the plaintiff showed no pecuniary loss resulting from diversion outside of its exclusive dealership arrangement. *See H.L. Hayden Co. v. Siemens Medical Sys., Inc.*, 879 F.2d 1005, 1024 (2d Cir.1989). Another seller of professional hair care products, Graham Webb, lost a tortious interference claim similar to the one brought in this case on the grounds of inability to show any—let alone irreparable—damages because it could not show that the increased sales from retail outlets did not offset the lost sales in salons. *See Graham Webb Int'l Ltd. Partnership v. Emporium Drug Mart, Inc.*, 916 F.Supp. 909, 918 (E.D.Ark. 1995). So too did Matrix Essentials Inc. lose a tortious interference case: "Just as in *Hayden*, Matrix profited from the initial sale of Matrix products to defendants. To the extent that Matrix claims damages based on loss of control over its distribution and marketing strategies, this is the very argument rejected by the court in *Hayden*." *Matrix Essentials, Inc. v. Cosmetic Gallery, Inc.*, 870 F.Supp. 1237, 1250 (D.N.J.1994).

■ The cases cited by JPMS for its claim that disruption of its professional hair care salon distribution system constitutes irreparable injury are inapposite. These cases allegedly support the claim that loss of reputation of a company's trade name is irreparably injurious. All but one of those cases involve trademark infringement. *See Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38 (2d Cir.1986); *Sara Lee Household & Personal Care UK Ltd. v. Almay, Inc.*, 1992 WL 309572 (S.D.N.Y. Oct.9, 1992); *Gucci America, Inc. v. Dart, Inc.*, 715 F.Supp. 566 (S.D.N.Y.1989); *Murjani Intern. Ltd. v. Sun Apparel, Inc.*, 1987 WL 15110 (S.D.N.Y. July 31, 1987). In trademark cases—and not in tortious interference or replevin cases—"a high probability of confusion as to sponsorship almost inevitably

establishes irreparable harm." *Church of Scientology Int'l,* 794 F.2d at 41.

This motion does not involve an accusation of trademark infringement and the integrity of JPMS trademark is not at issue. The presumption of irreparable harm simply does not apply here. The only non-trademark case cited by plaintiff stops short of stating that loss of goodwill as the result of diversion constitutes irreparable injury. The court found that a remedy at law would be inadequate, but noted that for the purposes of a permanent injunction "[i]rreparable harm is one, but not the only, basis for showing the inadequacy of a remedy at law." *Clorox Intern. Co. v. International Trade Expo, Inc.,* 1995 WL 106104, *8 (S.D.N.Y. March 9, 1995).

Moreover, the salon owners' testimony did not show injury to the reputation of the Paul Mitchell line of products. None of the salon owners testified to a belief that the quality of Paul Mitchell products had declined or was at risk of declining. Nor is there strong evidence that final consumers have come to believe that Paul Mitchell products are inferior because they are sold in mass retail outlets. Instead, the salon owners who testified admitted that they appreciated the efficacy of Paul Mitchell products and that they could not find adequate replacements for certain of the products. *See, e.g.,* Jarvis Dep., at 28–29.

The salon owners stopped selling Paul Mitchell products only because the product appeared in retail outlets. They could no longer guarantee a local monopoly on sales of the product, and switched to products for which they would be one of the only sellers in a locality. *See, e.g.,* Vaccaro Dep., at 33; Riggenbach Dep., at 26; Jarvis Dep., at 30. Although diversion angered the salon owners, and some salon owners apparently believe that JPMS purposefully and profitably sells products to non-salon retailers, the loss of goodwill was based on JPMS's purported inability to control diversion. The product's image remained otherwise untarnished. It stands to reason that the loss of goodwill is not permanent, but would dissipate if JPMS finds effective mechanisms to control diversion. The solution to that problem is not a preliminary injunction here—diversion will surely outlast this case regardless of its outcome.

Nor is such loss incompensable. Essentially, JPMS did not demonstrate that diversion hurts its product's reputation, but only proved that diversion can cause salon owners to stop carrying the Paul Mitchell product. Such losses—if they are net losses—are fully compensable by legal remedies. Loss of salon distributors can be quantified and damages can be assigned. Indeed, in *Jackson Dairy* —itself the standard bearer for the irreparable injury requirement—the Second Circuit noted that the loss of customers resulting from the breach of an exclusive distributorship agreement would be "readily compensable in monetary damages." 596 F.2d at 72. Where money damages would compensate for an injury, no injunction will issue.

**D. Success on the Merits of the Claim for Tortious Interference with Contract**

 Even had JPMS proven irreparable injury, one cannot say that JPMS will likely succeed on the merits of its tortious interference claim. In New York, a plaintiff charging a tortious interference with contractual relations must prove four elements: (1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional and unjustifiable inducement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff. *See Kronos, Inc. v. AVX Corp.,* 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 612 N.E.2d 289 (1993); *Alvord and Swift v. Stewart M. Muller Const. Co., Inc.,* 46 N.Y.2d 276, 281–82, 413 N.Y.S.2d 309, 385 N.E.2d 1238 (1978).

The proof of elements one and four is not reasonably in dispute. A contractual relationship existed between JPMS and CDM, *see* Plt. Exs. 54 & 97, although the 1999 sales of Paul Mitchell products to CDM were not covered by these contracts. JPMS also will likely prove damages, including resources expended on its effort to develop a Chinese market. In addition, JPMS will likely prove at trial that CDM breached its contractual obligations by diverting Paul Mitchell product—the virtual identity of the quantity and type of products shipped to CDM and the quantity and type of product received by Quality King alone demonstrates the substantial likelihood that JPMS will prevail on this point.

More difficult is whether JPMS will show that Quality King had knowledge of the CDM contract with JPMS and, if it did, whether Quality King induced CDM to breach that contract. JPMS alleges that Quality King's knowledge of the Paul Mitchell exclusive distribution system suffices to constitute knowledge by Quality King of the contract between CDM and JPMS. It also claims that the evidence shows that Quality King induced the breach by telling Niv Vigdor that Quality King would be interested in buying Paul Mitchell products and would be willing to pay more than the salon price.

At trial, JPMS will likely be able to prove that Quality King knew about the JPMS distribution scheme. Notwithstanding their denials, Quality King employees Nussdorf and Blick were informed about the salon-only distribution policy that Paul Mitchell seeks to defend. Their denials of more in-depth knowledge lack credibility given, among other things, their attempt to negotiate for the product, the fact that they offered a price which referenced the salon price, the fact that they never even tried to buy product directly from JPMS, and Blick's admission that she understood that distributors removed codes from boxes sold to Quality King so that JPMS could not trace and cut off the source. This Court does not find it credible that these sophisticated business people, responsible for negotiating the sales terms of Paul Mitchell products for a company that had $1.7 billion a year in revenue, were unaware of the JPMS distribution policy.

JPMS will have a more difficult time proving that Quality King knew that the only possible source of Paul Mitchell product would be a distributor or salon violating its contract. Although JPMS publicly states that it sells its products only through salons, this creates no legal obligation on its part to do so. From Quality King's perspective, JPMS may say that it only sells its product to distributors contractually bound to sell only to salons, but may in fact sell to distributors who have not made this contractual commitment. Indeed, CDM's 1999 purchases from Paul Mitchell were made on an order-by-order basis, apparently without a contract. Although this Court is satisfied by DeJoria's representations that JPMS did require such contracts from all distributors during the life of the CDM contract, *see, e.g.,* Tr. 101, Quality King did not have such sworn representations.

Other courts in factually similar circumstances have reached the same conclusion. In *Matrix Essentials, Inc. v. Cosmetic Gallery, Inc.,* another salon-only manufacturer sought to enforce its distribution policy against third parties by asserting tortious interference with contract pursuant to New Jersey law. The court there required particular knowledge of the anti-diversion provisions of the distribution contracts in order to show knowledge: "We do not equate general knowledge of the Matrix distribution scheme to knowledge of the existence or contents of the salon agreements." 870 F.Supp. 1237, 1247 (D.N.J.1994).

At this stage of the litigation, however, it is unnecessary to determine whether JPMS will prove that Quality King had knowledge of the JPMS–CDM contract, because its tortious interference claim will likely fail on the requirement that JPMS prove that Quality King inten-

tionally induced the breach of that contract. "In a tortious interference action, the plaintiff must show that tortfeasor's actions were the proximate cause of the breach of contract." *Don King Productions, Inc. v. Douglas,* 742 F.Supp. 741, 774 (S.D.N.Y.1990).

The evidence adduced at the hearing does not indicate that Quality King caused CDM to breach its contract with JPMS. To the contrary, it suggests that Robert Seibel, Jerome Alexander, Berin Alexander and Niv Vigdor needed no inducement to sell Paul Mitchell products to Quality King. Even JPMS asserts that CDM never intended to abide by the terms of its contracts with JPMS. From the beginning, CDM was apparently a mere vehicle to order large quantities of Paul Mitchell product and ship them back to the U.S. domestic market. Moreover, the testimony by Blick and Nussdorf about how Niv Vigdor approached them and asked them about their interest in Paul Mitchell products during 1997 indicates that CDM already actively sought to sell products to the United States in breach of its contract. Quality King was certainly a willing buyer, but there is no substantial evidence that it induced CDM to breach its contract.

The Court's conclusion in this case squares with a similar holding in *John Paul Mitchell Systems, G.A. v. Pete–N–Larry's Inc.,* 862 F.Supp. 1020 (W.D.N.Y. 1994). JPMS charged Pete–N–Larry's with tortious interference with contractual relations as a result of its unauthorized purchase and sale of Paul Mitchell products. On a motion for summary judgment, the court dismissed the cause of action as follows:

> [T]he plaintiffs' contention, when stripped of its conjectural allegations based on unsupported or unalleged facts, is that the defendants should be held liable for tortious inducement because they purchased Paul Mitchell Products while knowing that such products would not have been obtainable unless, presumably, someone along the

> JPMS's distribution network had breached his, her or its contract with JPMS. While the fact that the defendants are at least two steps removed from the contractual relationship does not necessarily relieve them of liability ... the plaintiffs' claim fails to show 'inducement' of the alleged breach. 862 F.Supp. at 1029.

JPMS's claim under Texas law against another retailer for tortious interference with contract also failed on similar grounds. In *John Paul Mitchell Systems v. Randalls Food Markets, Inc.,* 17 S.W.3d 721 (2000) (opinion subject to revision), the trial judge's decision to set aside a $15 million jury verdict was upheld on the grounds that knowledge of the JPMS "closed distribution system" must be coupled with proof that the retailer induced a party to breach its contract. *See* 17 S.W.3d at 731.

JPMS's evidence of inducement is that Quality King gave Niv Vigdor a list of products it would buy, including Paul Mitchell, and that it offered to pay above salon prices. *See* Tr. 462–64. This is insufficient to show that CDM was not seeking to divert these products all along or that Vigdor had already induced CDM to breach.

Plaintiff has suffered an injury, but it appears that its clearest recourse is against the contracting party—CDM—and perhaps CDM's principals. JPMS has not shown a likelihood of success on the merits on its claim against the third party Quality King for tortious interference with contract.

### E. No Injunctive Relief for Claim of Replevin.

Proof of irreparable harm would not change the outcome of this motion on the replevin claim either. This Court does not have the power to issue a preliminary injunction on the replevin claim.

A district court sitting in diversity jurisdiction has the power to issue a preliminary injunction pursuant to Fed.

R.Civ.P. 65, but must apply the substantive law of the forum state in such actions. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Kinderhill Select Bloodstock, Inc. v. United States*, 835 F.Supp. 699, 700 (N.D.N.Y. 1993). Thus, although federal law determines the standard for issuing such an injunction, state law determines whether the state law cause of action can support an injunction. In those cases where state law creates the cause of action and state law also precludes an injunctive remedy, the federal court is precluded from granting injunctive relief. *See* James Wm. Moore et al., 13 Moore's Federal Practice ¶ 65.07[2] (3d ed.2000); *Sims Snowboards, Inc. v. Kelly*, 863 F.2d 643, 647 (9th Cir. 1988). It would be anomalous to grant preliminary relief on a state law claim that would be unavailable were this case brought in a state court.

In New York, an action to recover chattel—i.e. replevin—is an action at law, and a plaintiff may seek equitable relief only if the chattel is unique. *See* David D. Siegel, *New York Practice* 514 (1999); *cf. Northern California Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 1306, 105 S.Ct. 459, 83 L.Ed.2d 388 (1984) (where a remedy at law is adequate, no injunctive relief shall be granted); *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 119 S.Ct. 1961, 1968, 144 L.Ed.2d 319 (1999) (the injunctive power of Rule 65 depends upon traditional principles of equity jurisdiction, including the requirement that remedies at law be exhausted before seeking equitable remedies). Thus, a judgment for possession in a replevin action generally includes an alternative award of a money judgment in the amount of the chattel's value at the time of trial. *See* N.Y. C.P.L.R. § 7108(a) (McKinney 1998). The money judgment is collected in the event that the chattel can no longer be found in the defendant's possession. *See id.*

Since replevin is an action at law, injunctive relief is generally not available to enforce it. Only where the chattel is unique may a court grant a preliminary injunction restraining sale or transfer of the chattel. *See* N.Y. C.P.L.R. § 7109(a) (McKinney 1998); *see also Prozeralik v. Johnston*, 182 A.D.2d 1108, 583 N.Y.S.2d 85 (1992). Generally, a unique chattel is something irreplaceable. *See Morse v. Penzimer*, 58 Misc.2d 156, 295 N.Y.S.2d 125 (N.Y.Sup.Ct.1968). Thus a "Ford truck" is not unique, but an antique Ferrari is "sufficiently unique" to be protected by an injunction. *Giordano v. Grand Prix Sales, Service, Restoration Co., Inc.*, 113 Misc.2d 395, 449 N.Y.S.2d 127, 131 (N.Y.Sup.Ct.1982).

These limitations are not procedural, but are based on the nature of replevin. To be entitled to injunctive relief in a claim for relief based on replevin, JPMS must demonstrate that the goods at issue are unique. If it cannot, the right protected by replevin is fully compensable by money damages.

The Paul Mitchell products at issue here are not unique, since they are mass produced items—more akin to the "Ford truck" than the "antique Ferrari." The almost one million bottles at stake in this litigation are joined by hosts more on sale all over the United States. If there ever were a shortage, JPMS presumably has the capacity to manufacture more. Injunctive relief is not available to prevent the sale of these items based on replevin.

## III. Conclusion.

For the reasons set forth above, John Paul Mitchell Systems's motion for a preliminary injunction is denied.