2019 IL App (1st) 162846-U
December 31, 2019

First Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 05 CR 746 |
| | ) | |
| JONAS HARO, | ) | Honorable |
| | ) | Geary W. Kull, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE WALKER delivered the judgment of the court.
Presiding Justice Griffin and Justice Pierce concurred in the judgment.

**ORDER**

¶ 1    *Held*:  In a postconviction proceeding, where a witness asserts his fifth amendment privilege in response to questions about a shooting, the court may draw an inference adverse to the witness that the witness participated in the shooting.  When the evidence shows several persons shot at the victims, an adverse inference that the witness participated in the shooting does not exonerate a defendant who could have participated with the witness in the shooting.

¶ 2    Jonas Haro, convicted of attempted murder, filed a postconviction petition alleging that

Joey Montoro's admissions proved Haro's actual innocence.  The trial court held an evidentiary

hearing at which Montoro invoked his fifth amendment privilege and refused to answer all questions. The trial court denied the postconviction petition. Haro contends on appeal that the court should have made an adverse inference that Montoro, not Haro, shot at the victims. We find that the trier of fact could infer from Montoro's silence that he participated in the shooting. However, in light of the evidence of multiple shooters, Montoro's testimony would probably not change the result for Haro on retrial. Accordingly, we affirm the denial of Haro's postconviction petition.

¶ 3                              I. BACKGROUND

¶ 4     Terrance Flynn's family threw him a birthday party at a bar in Berwyn on December 4, 2004. Two Chicago police detectives, Pat McCormack and Michael O'Donnell, came to the party as invited guests. An uninvited man came to the party wearing a hoodie. When some of the invitees complained to Flynn about the uninvited man's behavior, Flynn asked the man to leave. The man said, "You don't want to fuck with me. This is my neighborhood." But the man left.

¶ 5     Around 3:30 a.m. on December 5, 2004, after most of the guests had left the party, the uninvited man came back, still wearing the hoodie. Outside the bar, the man in the hoodie and at least one other man exchanged gunfire with the two detectives. O'Donnell caught Joseph Ayala, and nearby he found a gun on the ground. The man in the hoodie escaped. The detectives called Berwyn police, who arrested Ayala.

¶ 6     Detective Earl Briggs of the Berwyn Police Department interviewed McCormack and O'Donnell and summarized the interview in his report. He said that both McCormack and O'Donnell told him they followed the man in the hoodie to an alley, where the man turned and

pointed a gun at McCormack. The detectives described the man in the hoodie as about 5 feet 6 to 5 feet 10 inches tall, around 160 pounds, in his early twenties and Hispanic, with a tattoo on his chest of a crown. The report continues:

"McCormack *** identified himself as a Police Officer telling the subject to 'drop the gun.' The subject fled westbound through the alley with Det McCormack in foot pursuit ***. As Det McCormack entered the alley the subject was observed in a shooting stance. *** [T]he subject started firing shots in the direction of Det. McCormack. *** Det McCormack saw a second Male Hispanic firing a small caliber handgun in his direction. *** Det O'Donnell *** started to pursue the second subject that was firing at Det McCormack."

¶ 7    Commander Michael Cronin of the Chicago Police Department also investigated the incident and wrote in his report, dated December 5, 2004, "It should be noted that both [McCormack and O'Donnell] heard multiple gunshots from [s]everal directions and believe that additional offender/s may have been shooting." O'Donnell stated in his written report, submitted to the Chicago Police Department on December 5, 2004, "The offender and several other armed accomplices began to fire upon both [O'Donnell] and McCormack."

¶ 8    An officer at the Berwyn police station created a photo lineup for the detectives to view. He included a photograph of Haro because Haro fit the detectives' description, he belonged to the Latin Kings, who use crown tattoos to denote membership in the gang, and he was Ayala's brother. Both detectives identified Haro as the intruder in the hoodie who shot at them. Berwyn police arrested Haro at his home. They found no gun.

¶ 9    A grand jury indicted Ayala and Haro for the attempted murders of McCormack and O'Donnell, and for aggravated battery to McCormack.  Ayala pled guilty to aggravated battery of a police officer in exchange for a sentence of eight and a half years.

¶ 10    At Haro's jury trial Flynn testified that the intruder at his party wore a baby blue hoodie. Flynn did not identify Haro as the intruder.

¶ 11    McCormack testified that he saw a tattoo of a crown on the intruder's chest, visible under the open baby blue hoodie, and he recognized the crown as the symbol of the Latin Kings.  He reaffirmed the identification he made on the night of the shootings, that Haro wore the hoodie, intruded into the party and shot at McCormack and O'Donnell in the alley near the bar. McCormack testified that in the gun battle he saw Ayala and "two additional shooters.  One was Mr. Haro and there was somebody else there that [he] couldn't identify."  A bullet injured McCormack's hand.

¶ 12    O'Donnell testified that he came to the party very late, so he did not see the initial confrontation with the uninvited man.  He saw Haro, in a light blue hoodie, coming into the bar around 3:30 a.m.  O'Donnell saw the Latin Kings tattoo on Haro's chest.  O'Donnell also described the shooting and his capture of Ayala near the scene of the shooting.  O'Donnell testified that he "saw a third assailant *** in a shooting position behind a garbage can."  The third assailant came no closer than 150 feet away from O'Donnell, so O'Donnell "couldn't make out any physical features on his face to make an identification."

¶ 13    A forensic scientist from the Illinois State Police Crime Lab testified that she conducted tests on the black jacket taken from Ayala at the time of his arrest. She found "particles that were unique to gunshot residue" on the jacket's cuffs.

¶ 14    Several members of Haro's family testified that Haro stayed home on the evening of December 4, 2004. When they heard gunshots nearby, around 3:30 a.m. on December 5, 2004, each separately checked Haro's room and found him sleeping. Haro's mother testified that police frequently came to her home looking for Haro. Every time a shooting took place in Berwyn, police sought out Haro first for questioning.

¶ 15    Nello Pacilio testified that Flynn's family hired him to drive Flynn and some of the guests home in a limousine after the party. The other guests he would drive included McCormack and O'Donnell. Pacilio saw Joey Montoro, a member of the 12th Street Players gang, come into the party, wearing a black hoodie. He saw Flynn ask Montoro to leave, and he heard Montoro threaten to shoot the guests. But Montoro left. According to Pacilio, Montoro returned to the bar around 3:30 a.m. Pacilio saw part of the confrontation between Montoro and the detectives outside the bar, and soon after that confrontation, Pacilio heard gunshots. Pacilio testified that several years earlier, he, too, had belonged to the 12th Street Players, and the bar stood in Players' territory.

¶ 16    Haro's brother Eli testified that shortly after the shooting, Haro's friend, Montoro, came to Haro's house, saying someone was chasing him. Montoro wore a black jacket with a black hoodie underneath. Montoro called for a cab from Haro's house. Montoro told Eli that he had shot someone in the head. Teodoro Cano, also a brother of Haro, confirmed that he, too, saw Montoro at the Haro family's home that night, and Montoro wore a black jacket.

5

¶ 17    The jury found Haro guilty of the attempted murders of McCormack and O'Donnell, and of aggravated battery with a firearm for the injury to McCormack's hand. The court sentenced Haro to 45 years in prison on each of the counts for attempted murder, and to 40 years for aggravated battery, with the sentences to run concurrently. Haro appealed. The appellate court affirmed the convictions and the sentences. *People v. Haro*, 2011 IL App (1st) 093047-U (unpublished decision under Supreme Court Rule 23).

¶ 18    In December 2012 Haro filed a postconviction petition, claiming that new evidence proved he did not commit the offense. He attached to the petition affidavits signed by Ayala and Montoro. Montoro said in his affidavit that he went to the bar in Berwyn, where he got into an argument. He returned to the bar with a gun. Some men came out of the bar and chased Montoro to an alley, and then started shooting at him. Montoro returned fire. He ran off when his bullets ran out. He added, "Jonas Haro is a in[noc]ent man, and I feel very bad that he's doing time for something I did."

¶ 19    The trial court held an evidentiary hearing on the allegations of the postconviction petition. Ayala testified at the hearing that on December 5, 2004, after attending a party for work, he went to his parents' home in Berwyn around 3 a.m. Montoro called to ask for a ride. Ayala met Montoro near the home of Ayala's parents. After they drove off Ayala stopped and got out of the car to urinate. Montoro walked off towards the bar. Ayala soon saw Montoro running in the alley, chased by several men who were shooting at Montoro. Ayala took cover behind a utility pole. When the shooting stopped an officer arrested Ayala. Ayala said he saw Haro sleeping in his parents' home shortly before the shooting, and he did not see Haro outside at the time of the

shooting. Ayala testified he did not have a gun in his possession at any time on December 5, 2004. He offered no explanation for the Crime Lab's finding of gunshot residue on his jacket.

¶ 20 Montoro appeared in court, but he refused to answer all questions on grounds that his answers might incriminate him.

¶ 21 The court stated:

"I don't find Mr. Ayala to be believable; and *** his testimony alone, standing alone is insufficient to grant the Petitioner a new trial.

***

*** [I]f I were to believe that Mr. Montoro would have, in fact, testified to what he's stated in his affidavit at trial, I think it would be clear that Mr. Haro would be entitled certainly to a new trial ***.

*** Mr. Montoro's *** refusal to testify to me indicates that at no time will he ever testify to this ***; that whether or not that affidavit could ever be admitted at a trial *** his refusal to take responsibility to me diminishes if not completely undermines his credibility as to his statements."

¶ 22 The court denied Haro's petition. Haro now appeals.

¶ 23                    II. ANALYSIS

¶ 24 Haro contends that the trial court should have awarded him a new trial because Montoro's affidavit and testimony sufficiently proved Haro's actual innocence. "[W]e review the circuit court's denial of a postconviction petition following an evidentiary hearing to determine whether

it was manifestly erroneous." *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009). Our supreme court established the applicable principles:

> "[I]n order to succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial ***.
>
> *** Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *People v. Coleman*, 2013 IL 113307, ¶ 96-97.

¶ 25    When Montoro testified at the evidentiary hearing, he did not swear to the statements he made in the affidavit. Instead, he pled the fifth amendment. Haro argues that the court should have drawn an adverse inference from Montoro's refusal to testify, and the adverse inference suffices as proof of Haro's actual innocence.

¶ 26    A postconviction proceeding "is a collateral attack on the judgment of conviction and is civil in nature." *People v. Johnson*, 191 Ill. 2d 257, 270 (2000). "Depending on the circumstances of a case, a non-party's invocation of the Fifth Amendment may be used to draw adverse inferences against a party in a civil case." *John Paul Mitchell Systems v. Quality King Distributors, Inc.*, 106 F. Supp. 2d 462, 471 (S.D.N.Y. 2000).

¶ 27    In civil cases, such as a postconviction proceeding, a court may draw an adverse inference from a witness's refusal to testify. *People v. Gibson*, 2018 IL App (1st) 162177, ¶ 86.

¶ 28    We find that the trier of fact could draw an adverse inference against Montoro in a postconviction proceeding because of the invocation of his fifth amendment rights. See *Canter v.*

*Cook County Officers Electoral Board*, 170 Ill. App. 3d 364, 369 (1988).  A trier of fact could infer that Montoro invoked the privilege because he shot at McCormack and O'Donnell on December 5, 2004.  We note, however, the assertion in Montoro's affidavit that "Jonas Haro is a in[noc]ent man, and *** he's doing time for something [Montoro] did" does not conflict with Montoro's interests.  The limited inferences adverse to Montoro do not support a conclusion that Haro did not participate in the gun battle.  See *Baxter v. Palmigiano*, 425 U.S. 308, 317-18 (1976) (only limited inferences arise from relying on the fifth amendment and refusing to testify).

¶ 29    Haro contends that because the arrest report for Ayala mentions only two shooters, the trier of fact should infer that only two persons, Montoro and Ayala, shot at police.  We find that the arrest report, which neither McCormack nor O'Donnell wrote, does not substantially impeach their testimony about a third shooter.  The report of the Chicago Police Department Commander and O'Donnell's written report, both dated December 5, 2004, state that at least three persons shot at the detectives.

¶ 30    Moreover, all the witnesses at trial testified that the man involved in the initial altercation at the bar who returned with a gun wore a light blue hoodie, while all the witnesses, including the defense witnesses, testified that Montoro wore a black jacket or a black hoodie on the night of the shooting.  We find that the trial court did not commit manifest error in finding that Montoro's testimony would probably not change the result on retrial.

¶ 31                                III.  CONCLUSION

¶ 32    In a postconviction proceeding, the trier of fact could draw an adverse inference against Montoro because of his refusal to testify.  However, the adverse inference does not amount to

conclusive evidence of actual innocence that would probably change the result if the court retried

Haro. Accordingly, we affirm the denial of Haro's postconviction petition.

¶ 33     Affirmed.