VORNADO PS, L.L.C., a Delaware limited liability company, Plaintiff,

v.

PRIMESTONE INVESTMENT PARTNERS, L.P., a Delaware limited partnership, Defendant.

C.A. No. 19264.

Court of Chancery of Delaware, New Castle County.

Submitted Oct. 9, 2002.
Decided Dec. 19, 2002.

Stephen E. Herrmann, Jesse A. Finkelstein, J. Travis Laster, Peter B. Ladig, Richards, Layton & Finger, Wilmington, Delaware, and Robinson B. Lacy, Michael A. Cheah, Sullivan & Cromwell, New York, New York, for Plaintiff.

William M. Lafferty, James G. McMillan, III, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, and Theodore R. Tetzlaff, Rodney D. Joslin, Brent D. Stratton, Jeffrey C. Torres, McGuirewoods, LLP, Chicago, Illinois, John K. Crossman, Jeffrey L. Friesen, Dreier & Baritz, LLP, New York, New York, for Defendant.

## OPINION AND ORDER

LAMB, Vice Chancellor.

### I.

This action arises out of two loans advanced to the defendant, a Delaware limited partnership engaged in the business of commercial real estate development, by the plaintiff, a Delaware limited liability company also engaged in the business of commercial real estate development. The loans were secured by units in a limited partnership. The borrower eventually defaulted on the loans, and the lender sought to dispose of the units in an open outcry auction. After a significant marketing process by the lender's financial advisor, the lender made the only bid at the auction and purchased the units.

The lender brought this action and now moves for summary judgment seeking a judicial determination that it is entitled to enforcement of its loans. The lender also seeks a declaration that its foreclosure auction was conducted in a commercially reasonable manner, and that it was the winner of the auction. The borrower opposes the summary judgment motion and also has counterclaimed on a variety of theories, including breach of contract, fraud, tortious interference, and breach of fiduciary duties.

The motion for summary judgment must be granted. There are no genuine issues of material fact related to the lender's right to enforce the provisions of its loan. There are also no genuine issues of fact related to the commercial reasonableness of the foreclosure auction of the units or the fact that the lender was the winning bidder of the auction.

The counterclaims must also be dismissed. A declaration that the lender is entitled to enforce its loans and that it is

the winner of a reasonably conducted auction precludes many of the counterclaims. The tortious interference claims must be dismissed because the borrower waived enforcement of certain contracts at issue and because the borrower has failed to show that any business relations with a third party actually existed. Further, the fraud-based claims have either been waived or are precluded by an integration clause in the loan agreement. Finally, the fiduciary duty claim must be dismissed because the borrower was not owed a fiduciary duty by the lender.

## II.

### A. *The Units*

Primestone Investment Partners L.P. ("Primestone") is indebted to Vornado PS, L.L.C. for two loans: (1) a $62,000,000 loan made by Vornado on September 26, 2000 (the "Vornado Loan") and (2) a $40,000,000 loan originally made by Prudential Securities Corporation in 1997 (the "Prudential Loan"). To secure this debt, Primestone pledged 7,944,893 limited partnership units (the "Units") of Prime Group Realty, L.P. ("PGRLP"). Both loans are guaranteed by five affiliates of Primestone (the "Guarantors"). Primestone and each of the Guarantors (together, the "Private Prime Parties") are under common control.

Subject to certain conditions, the Units are exchangeable on a one-for-one basis into shares of Prime Group Realty Trust ("PGE"), a company publicly traded on the NYSE. If a holder of the Units seeks to exchange them for PGE shares, however, PGE has the option of paying the holder cash rather than delivering the shares. PGE's main asset is partnership units in PGRLP. For each partnership unit owned by PGE, there is one common share

of PGE outstanding. The Units themselves do not entitle the holder to any voting rights in relation to PGE, and only limited voting rights with respect to PGRLP.[1] The exchangeability of the Units into PGE shares is further limited by PGE's Declaration of Trust, which prohibits any one investor from holding more than 9.9% of PGE stock without the consent of PGE's Board of Trustees (the "PGE Board"). If such consent were given and all of the Units were converted, the Units would amount to 30.1% of PGE's common stock.

### B. *The Loans*

On September 26, 2000, the $62,000,000 Vornado Loan was advanced pursuant to a Loan Agreement between Primestone, the Guarantors, Michael Reschke, Chairman of PGE's Board, and Vornado. Pursuant to Section 4 of the Vornado Loan Agreement, the Vornado Loan matured on October 25, 2001, at the latest. The Vornado Loan also contained a "no shop" provision that prohibited Primestone, during the term of the Loan and for thirty days thereafter, from discussing or soliciting a refinancing without the written consent of Vornado. Further, the Loan contained a "right of first offer" provision, which provided that if Primestone sought to arrange for refinancing of the Loan with a third party, Vornado had the first right to match the proposed refinancing arrangement and thereby supersede the new lender. The Vornado Loan was made, in part, due to ongoing negotiations between Primestone and Vornado related to a possible joint venture with or acquisition of Primestone by Vornado. Such a transaction never occurred.

At the time the Vornado Loan Agreement was executed, Primestone was al-

---

**1.** Examples of events where holders of the Units could vote on a transaction involving PGRLP include mergers, sales of all the assets of the partnership, or bankruptcy.

ready indebted under the Prudential Loan for the principal amount of $40,000,000. The Prudential Loan was also secured by the Units and was senior to the Vornado Loan. The Prudential Loan is governed by an Amended and Restated Credit Agreement between Primestone and Prudential dated as of September 26, 2000.

Vornado and Prudential entered into an Intercreditor Agreement on September 26, 2000 to determine their respective rights in the Loans. Primestone signed and was bound by, certain provisions of the Intercreditor Agreement. Section 15 of the Intercreditor Agreement, however, provides: "This Agreement is solely for the benefit of the Lenders and no other person or entity shall be entitled to rely on or is intended to receive any benefit under this Agreement."

## C. *The Extension Of The Prudential Loan*

According to its terms, the Prudential Loan matured on September 26, 2001. By September 25, 2001, however, Prudential extended its Loan to an "Expiration Date" of November 30, 2001, at the latest.[2] Pursuant to the Intercreditor Agreement, Vor-

nado's consent was required for this extension. Vornado consented, but explicitly refused to modify the terms of the Vornado Loan and received a liability release in return.[3]

The day after the Prudential Loan was extended, Primestone wrote Vornado to reiterate that it planned to "comply with the terms of the [Vornado] Loan Agreement," and that it would be "contacting [Vornado] shortly regarding the refinancing of the Loan." Primestone repeatedly asked Vornado to extend the maturity of its Loan. Several meetings were held related to the Loan around October 10 and 11. Vornado, however, told Primestone that it would not extend the Loan unless Primestone repaid at least a part of it. Primestone did not agree to such a "pay down," and the parties never agreed to extend the Loan. On October 24, 2001, Vornado notified Primestone in writing that it was required to repay the Vornado Loan the following day.

## D. *Primestone's Defaults*

When the Vornado Loan matured by its terms on October 25, 2001, Primestone failed to pay. This amounted to an Event

---

2. Section 5 of the First Amendment to Prudential Credit Agreement provided:
 "Expiration Date" means the earlier of (i) the repayment of the Vornado Loan, (ii) November 30, 2001, or (iii) the date on which a Change of Control of any of the Borrower, any Guarantor, Prime, or the REIT has occurred.

3. Vornado's written consent contained the following statement:
 The Borrower acknowledges that the Loan Agreement and other Credit Documents remain in full force and effect. The Borrower also acknowledges and agrees that Vornado has not waived, and shall not be deemed to have waived, any current or future Default or Events of Default.
 The written consent also included a release of any claims Primestone might have had against Vornado:

The Borrower ... does hereby acknowledge that there are no valid defenses to any obligation of any Borrower Party under any of the Credit Documents, and the Borrower, for itself and for each other Borrower Party, does hereby unconditionally release and absolutely forever discharge Vornado ... from any and all claims, demands, actions, omissions, debts, liabilities, obligations, accounts and causes of action of every kind and nature whatsoever whether related to (a) the Loan and the Loan Agreement and/or the other Credit Documents, or (b) otherwise, whether presently know or unknown, suspected or unsuspected, which Borrower Party had or now has against Lender Party.

of Default under Section 15(a) of the Vornado Loan Agreement. Vornado notified Primestone of its default in a letter dated October 26, 2001, even though such notice was not required.

It was at this point that Primestone took the position that Vornado agreed to extend its Loan beyond October 25, 2001. In a letter dated October 26, Primestone denied that an Event of Default had occurred. Primestone maintained that:

By consenting to the extension of the Prudential Loan to a date beyond the original maturity date of the [Vornado Loan] ... we contend that you have extended the maturity date of the [Vornado Loan] to November 30, 2001 as well, and that therefore an Event of Default does not in fact exist as of the date hereof.

Vornado responded in a letter dated October 30, 2001, and stated that in its view such an extension had not occurred.

Primestone's failure to pay the Vornado Loan on October 25 also amounted to a default under Section 8.01(s) of the Prudential Credit Agreement. This cross-default allowed Prudential to accelerate its Loan under 8.02 of the Prudential Credit Agreement. Prudential did so on October 25, 2001.

In a separate letter on October 26, Prudential issued a "margin call" to Primestone. The Prudential Credit Agreement allowed Prudential to make a margin call if the loan-to-value ratio of the Prudential Loan exceeded 40% calculated based on the price of PGE's shares. On October 26, the shares closed at $9.85, and the loan-to-value ratio of the Prudential Loan was well in excess of 40%.

To satisfy the margin call, Primestone had to provide additional collateral or pay down the Loan to reduce the loan-to-value ratio to no more than 30% within two business days. Primestone failed to do so, and as a result, on October 30, 2001 a second default occurred under the Prudential Credit Agreement. This in turn caused a second Event of Default under the cross-default provision of the Vornado Loan Agreement.

E. *Vornado's Purchase Of The Prudential Loan*

Under the Intercreditor Agreement, Vornado was required to obtain the consent of Prudential or purchase the Prudential Loan before enforcing its rights as a secured creditor. On October 31, 2001, after discussions with Prudential, Vornado purchased the Prudential Loan for the net amount then due, $37,978,479.97. The purchase of the Prudential Loan by Vornado terminated the Intercreditor Agreement.

F. *Vornado's Discussions With Cadim*

The Private Prime Parties were introduced to Cadim, Inc. in the summer of 2001. Cadim proposed that it lend Primestone money to refinance the maturing Vornado Loan, and that Cadim, in a joint venture with Primestone and its affiliates, would acquire the balance of the outstanding units in PGRLP and shares in PGE through a public tender offer. To decide how a potential transaction would proceed, Cadim decided it needed access to confidential information about the assets and liabilities of PGE. Accordingly, Cadim executed certain confidentiality agreements ("SSAs"). Pursuant to SSA No. 1, Cadim agreed that it would use PGE's confidential information for the sole purpose of pursuing a transaction contemplated with the Private Prime Parties.

On August 22, 2001, Cadim, Primestone,

PGI,[4] and other Private Prime Parties signed a Memorandum of Understanding ("MOU"). The MOU reflected the agreement of the parties to proceed with a transaction wherein Cadim, together with certain of the Private Prime Parties would acquire all the outstanding shares of PGE and all the outstanding units in PGRLP.

The day after signing the MOU, Cadim and PGI submitted a written offer to PGE to acquire 100% of PGE and PGRLP at a price of $14 per share/unit. On August 30, 2001, after several days of negotiations with the independent directors of the PGE Board and their advisors, Cadim and PGI increased its offer to $14.50 per share/unit. It was at this point that Cadim and certain of the Private Prime Parties, including Primestone, entered into the Amended and Restated MOU (the "Amended MOU"). The Amended MOU provided that Cadim would conduct due diligence and negotiate the acquisition of PGE. It also offered to refinance the Vornado and Prudential Loans.

On September 14, 2001, Cadim, PGI, PGE, and PGRLP entered into SSA No. 2.[5] SSA No. 2 repeats and reaffirms all of Cadim's confidentiality and "sole use" obligations that are contained in SSA No. 1. Again, Cadim agreed to use the confidential information regarding PGE and PGRLP that it received "solely for the purpose of determining the desirability of the Proposed Transaction" with PGI. The purpose of the amendment was to extend certain time periods in the agreement due to the disruption caused by the national tragedies, which occurred on September 11, 2001.

Any obligations by Cadim under the Amended MOU terminated, however, if Cadim did not deliver to the PGE Board and the Private Prime Parties a notice regarding its intention to consummate a transaction within 30 days of signing the Amended MOU. No such notice was ever sent. Accordingly, the Amended MOU terminated by its terms on September 29, 2001.

In early October 2001, a few days before the Vornado Loan became due, Cadim told Reschke that it wanted to find a partner to join Cadim and the Private Prime Parties in the proposed acquisition of the common shares and common units of PGE and PGRLP. On October 10, 2001, Cadim sent a letter to Reschke on what it said was an "emergency basis." The letter stated that Reschke must "immediately acknowledge the letter to permit Mr. Dansereau [vice president of investments for Cadim] the opportunity to meet with several investors in New York to identify a participant to 'save *our* deal with PGE.'" Accordingly, the letter states "each party hereby releases Cadim from the confidentiality obligations with respect to the Evaluation Material," as that term is defined in SSA No. 4.[6] The letter further declared, "the [MOU] is hereby null and void and of no further legal effect...."

---

4. PGI is a limited partner of Primestone and is the administrative member of PG/Primestone, L.L.C., which is the general partner of Primestone. PGI is one of the Private Prime Parties.

5. There is also an SSA No. 3 dated August 23, 2001, among Cadim, PGI, Primestone, Primegroup VI, L.P., Prime L.P., PGLLC, and Mr. Reschke (the president, CEO and chairman of PGI). SSA No. 4 is dated August 30, 2001, and is executed by the same parties. *See* note 43 *infra* for a summery of the SSAs.

6. The letter states: "unless otherwise indicated, all capitalized terms have the meaning given them in the [SSA], dated as of August 30, 2001, as amended by Amendment No. 1 dated September 14, 2001...." That agreement is SSA No. 4.

The definition of "Evaluation Material" in SSA No. 4 differs from the definition of "Evaluation Material" in SSA No. 2. SSA No. 4 defines "Evaluation Material" as confidential information about Residential Newco and the PGI Parties." SSA No. 2 defines "Evaluation Material" as "all information regarding PGE, PGLP [PGRLP] and their subsidiaries...." Reschke signed the October 10 letter, thus permitting Cadim to discuss alternative transactions with third parties. By signing the October 10 letter, Reschke only released Cadim from the confidentiality and "sole use" provisions of SSA No. 4. The obligations of SSA No. 2 remained in force.

On the evening of October 18, 2001, Danserau telephoned Vornado's president, Michael Fascitelli. Dansereau notified Fascitelli that he was calling Vornado based on suggestions from Reschke and from Mark Landau, PGE's financial advisor.[7] This telephone call marked the first contact between representatives of Cadim and Vornado. The conversation lasted no more than 20 minutes, during which time Fascitelli listened to Dansereau and stated only that Vornado was not interested in acquiring PGE, Primestone or their affiliates.

Following their October 18 telephone call, Fascitelli and Dansereau agreed to meet in person. Between October 18 and October 29, one or two phone calls were made solely for the purpose of arranging the meeting. Representatives of Cadim and Vornado agreed to meet on October 29 in Vornado's New York City offices. On October 19, 2001, in response to Vornado's request, PGE wrote a letter to Vornado to consent "to Lender, Vornado Realty, L.P.,

and Vornado Realty Trust having discussions with Cadim inc. [sic] in connection with a possible strategic transaction relating to [PGE] and [PGRLP]." [8]

Before the scheduled meeting on October 29, two important events occurred. First, Cadim and Reschke terminated all negotiations on October 20. According to Primestone, "Cadim informed the Private Prime Parties that it would not complete the Global Transaction agreed to in the Amended MOU and Cadim would discontinue any discussions with the Private Prime Parties with regard to the acquisition of PGE Realty or any other aspect of the Amended MOU." [9] Second, as discussed above, Primestone defaulted on the Vornado and Prudential Loan five days earlier.

Vornado and Cadim representatives met in person for the first time on October 29. Vornado's objective at this meeting was to sell Cadim all or part of the Loans in order to reduce its exposure to Primestone. Vornado also appeared interested in a potential joint venture with Cadim to acquire all of the outstanding shares of PGE.

Had Cadim not earlier engaged in significant amounts of due diligence, there would have been little chance that Cadim would have purchased any part of the Loans. Fascitelli testified that Vornado was interested in what due diligence "process they took, how much work they had done" so that Cadim "would have enough information to make a judgment on whatever deal was going to come up, including buying our loan." [10] Dansereau explained to Vornado the due diligence process Cadim had already gone through. Cadim eventually provided a written overview of

7. It should be noted that Fascitelli and Landau are friends because their wives are best friends from college.

8. Silverstein Aff. Ex. 16.

9. Def. Amend. Countercl. at 30.

10. Fascitelli Dep. at 104.

its due diligence procedures to Vornado, entitled: "Summary of the due diligence procedures performed in view of obtaining comfort for the contemplated acquisition of all the outstanding shares of PGE jointly with PGI."

Vornado asked for such a document because Vornado "wanted to satisfy themselves as to the extent of the due diligence and the scope of the due diligence that we carried out during that period of time from roughly August 23 to October 5" concerning PGE and PGRLP.

The next meeting between Cadim and Vornado was November 2, 2001. At that meeting Dansereau said that Cadim was willing to purchase half of the Prudential and Vornado Loans. Because Cadim had entered into certain standstill agreements with PGE and PGRLP, it could not enter into a loan participation agreement without PGE's and PGRLP's consent. Cadim obtained that consent in a Consent and Agreement dated November 16, 2001. On November 19, 2001, Cadim purchased a 50% participation in the Loans for approximately $50 million. In other words, Cadim purchased the Loans at par.

### G. *PGE's Sale Of Dearborn Center To Bank One*

PGE hoped to sell its Dearborn Center property in Chicago to Bank One by 2003. Before October 23, 2001, however, Bank One president Jamie Dimon informed Reschke that Bank One had decided to reconsider the offer. On October 23, Reschke wrote a letter to Dimon expressing disappointment over Bank One's decision not to purchase Dearborn Center. Vornado was notified that the potential sale of Dearborn Center to Bank One had fallen through when Fascitelli met with Reschke on October 24.

On the basis of Fascitelli's friendship with Dimon, Primestone alleges that Vornado tortiously interfered with PGE's prospective contract with Bank One. Fascitelli, however, did not meet with Dimon until after Bank One had decided not to purchase the Dearborn Center. Moreover, Vornado had no motive to interfere with the sale. As a mezzanine lender to this project, Vornado would have benefited from the sale.

### H. *The Foreclosure Sale*

When Primestone failed to pay the two Loans, Vornado sought to sell the pledged Units in PGRLP in a commercially reasonable manner pursuant to Article 9 of New York's Uniform Commercial Code. It hired Goldman, Sachs & Co., a prominent investment banking firm, to assist it in developing a marketing process and identifying potential purchasers of the Units. Because the Units were not subject to an established trading market, Vornado believed Section 9–610(c) of the New York Uniform Commercial Code prohibited Vornado from buying the Units unless they were sold in a public sale. Vornado wanted an opportunity to purchase the Units and felt it might be the most willing and able potential purchaser of the Units. As a result, Vornado decided that Goldman Sachs's efforts to market the Units would culminate in a public auction.

On October 31, 2001, Vornado provided notice to Primestone and the Guarantors that it intended to sell the Units at a public auction scheduled for 4 p.m. on November 20, 2001. A licensed auctioneer was retained. Advertisements marketing the foreclosure sale were published in the *New York Times* on November 6 and 13, and in the *Chicago Tribune* on November 7.

In conjunction with Goldman Sachs's marketing efforts, Vornado sought assistance from Primestone and PGE to make

the Units more marketable. As discussed above, no more than 9.9% of the Units may be converted into PGE common stock without the consent of the PGE Board. Vornado had obtained the Board's consent to convert all the Units into shares in a Consent and Agreement dated September 26, 2000 (the "9.9% Waiver"). On October 31, 2001, Vornado wrote to Reschke to request that the PGE Board allow Vornado to assign the 9.9% Waiver to third parties. Vornado also asked the PGE Board to release certain entities from certain standstill agreements with PGE so that they could acquire the Units. By a letter dated November 7, 2001, PGE rejected both of these requests.

With the assistance of Vornado's counsel, Goldman Sachs assembled an Information Memorandum regarding PGRLP and the Units. The Information Memorandum only provided publicly available information to potential purchasers. This is due primarily to the fact that Vornado, a creditor, did not have access to much of PGE's or PGRLP's confidential information. The Information Memorandum stated that it "does not purport to be all-inclusive or to contain all of the information that prospective purchasers may desire." Cadim and Vornado, however, did possess some material non-public information regarding PGE and PGRLP. The Bidding Agreement, attached as Appendix A to the Information Memorandum, explicitly required potential bidders to acknowledge that, "Vornado may have received non-public information from PGE or its affiliates that has not been disclosed to the Bidder and which may be material to the Units and Shares." [11]

In early November, Vornado and Goldman Sachs compiled a list of, and contacted, 51 potential purchasers, including public companies, opportunity funds, private investors, pension funds and advisors (including PGE and the Private Prime Parties). An additional 8 potential purchasers were contacted either through referrals or by unsolicited calls from those bidders. Vornado also requested Primestone to provide a list of potential purchasers, but no response was ever received. Ultimately, copies of the Information Memorandum were sent to 33 potential purchasers, including PGE and the Private Prime Parties.

Some of the potential purchasers of the Units contacted by Goldman Sachs stated that they were not interested because of the unavailability of confidential information. For example, Mark Reinisch of Klaff Realty, "explained that they are not interested in participating in the auction because they do not have access to private information." [12] Similarly, Nick Rizzo of Westbrook Partners L.L.C. "did not feel comfortable with only having public information. He explained that they will not be participating in the auction." [13]

Although Goldman Sachs was responsible for attracting potential purchasers for the Units, it appears to have had relatively little knowledge about what it was actually marketing. Specifically, Adam Rosenberg, Goldman Sachs's point man for this project, knew very little about PGRLP. PGE's sole asset is units in PGRPLP, which is an operating partnership. The Units themselves (i.e., the collateral Rosenberg was supposed to market) are limited partnership units in PGRLP, representing 30.1% of all such units. Rosen-

---

11. Rosenberg Aff. Ex. B at Appendix A.

12. Rosenberg Dep. at 134–36; Rosenberg Aff. Ex. 6.

13. Rosenberg Dep. 138–41; Rosenberg Aff. Ex. 6.

berg, however, testified that he did not know much about PGRLP.[14] He stated that he "didn't do an evaluation of the operating partnership documents,"[15] and further testified that, "I don't have any knowledge regarding this particular operating partnership or what it does or doesn't do."[16]

In a November 8, 2001 letter to Vornado, Primestone objected to Vornado's auction process as "commercially unreasonable." It proposed an additional nine-week marketing process (including "management road shows" and property tours), which would culminate in a multi-round "private auction."[17] Primestone was also concerned that the Units, which could amount to over a 31% stake in PGE, were not being marketed as a control block.

Primestone filed for bankruptcy on November 19, and Vornado was forced to cancel the foreclosure sale scheduled for the next day. Primestone's bankruptcy filing was subsequently dismissed as having been filed in bad faith, and Vornado rescheduled the auction for January 25, 2002. Goldman Sachs notified potential purchasers of the new date. Four of these potential purchasers, who had not been previously contacted by Goldman Sachs, were either referred to Goldman Sachs by entities it had previously contacted or were entities who contacted Goldman Sachs on an unsolicited basis. Two potential purchasers did not wish to bid any longer. Based on this information, beginning on or about December 22, Goldman Sachs distributed copies of the updated Information Memorandum to 33 potential purchasers (including PGE and the Private Prime Parties).

The January 25 auction was canceled when Primestone obtained a stay pending appeal of the bankruptcy dismissal to the United States District Court. After that court affirmed the dismissal of the petition and vacated the stay, Vornado rescheduled the foreclosure sale for February 25, 2002. Beginning on or about February 11, 2002, Goldman Sachs contacted the potential purchasers to notify them that the foreclosure sale had again been rescheduled. Two of the potential purchasers, who had not been previously contacted, were either referred to Goldman Sachs by entities it had previously contacted or were parties who contacted Goldman Sachs on an unsolicited basis. Vornado also retained its auctioneer again and published advertisements regarding the rescheduled auction in the *New York Times* and *Chicago Tribune* on February 14, 2002. Plans for the foreclosure were again canceled when the United States Court of Appeals granted a stay pending appeal on February 15.

On March 28, 2002, PGE filed a 10–K report with the Securities and Exchange Commission. That filing disclosed that Ernst & Young, PGE's auditor, included a "going concern" reservation in their audit report on PGE's financial statements based on short-term liquidity problems and the ability of PGE's Series A Preferred stockholders to require PGE to re-

---

14. Rosenberg testified:

 My experience with REITS set up to have operating partnerships in general is that they would have some rights with respect to the operating partnership, but for this particular operating partnership I don't know what the nature of those rights is or whether there are any rights or whether those rights include voting rights or other types of rights.

Rosenberg Dep. at 78–79.

15. *Id.* at 79.

16. *Id.* at 80.

17. Primestone further objected to the auction procedures as "commercially unreasonable" by letters from Reschke dated January 3, 2002, April 23, 2002, and April 29, 2002.

deem the shares for $40 million. The audit report also disclosed that PGE's largest tenant was Arthur Anderson and that its failure to continue to pay rent would have an adverse effect on PGE. As a result of the 10–K filing, PGE's stock price fell significantly. On March 28, the stock closed at $7.66, down $1.49 from the previous day's close. On April 1, the stock fell to $4.05 in intraday trading, setting a new all-time low for the company.

On April 8, a group of stockholders wrote an open letter to the PGE Board calling for Reschke's resignation. Reschke resigned his post as chairman of PGE (although he remains a trustee), and Richard Curto resigned as PGE's chief executive officer. On April 12, PGE announced that it was cutting 13% of its workforce and that it was not paying dividends to its preferred stockholders. Because of this news, trading of PGE's shares was halted on the morning of April 12.

On April 12, the Court of Appeals conditioned the stay pending appeal on the posting of a $15 million bond by the end of business on April 17. Primestone did not post the bond and the stay was automatically lifted. In preparation for the possibility that the stay might be lifted, Goldman Sachs updated its Information Memorandum based on then-current publicly available information. Vornado, in consultation with Goldman Sachs, decided that if Primestone's stay was lifted on April 17, rescheduling the foreclosure sale for April 30, 2002 would provide sufficient time to remarket the Units.

On April 18, 2002, Vornado gave notice to Primestone and the Guarantors that the foreclosure sale would be held on April 30. Newspaper advertisements were again placed in the *New York Times* and the *Chicago Tribune* on April 22. A licensed auctioneer was again retained to conduct the auction. Goldman Sachs again approached all the potential purchasers it had contacted in February to notify them that the foreclosure auction had been rescheduled for 4 p.m. on April 30, 2002. Five additional potential purchasers were contacted, and Goldman Sachs ultimately distributed an updated Information Memorandum to 42 potential purchasers (including PGE and the Private Prime Parties).

By April 30, three prospective purchasers in addition to Vornado had expressed interest in bidding at the auction: (1) the Blackstone Group, (2) Friedman Billings & Ramsely ("FBR"), and (3) Cadim. On April 30, representatives of these entities attended the foreclosure sale at the offices of Sullivan & Cromwell.[18]

The terms of the auction set forth in the final Information Memorandum provided that the sale to the winning bidder would be settled at a time selected by the purchaser up to 30 days after the auction. Because of the resulting exposure to the purchaser's credit, the terms required bidders to qualify by submitting a financing commitment or other satisfactory evidence of their ability to complete the purchase. Bidders were also required to sign a bidding agreement.

Primestone also expressed interest in bidding for the Units. At the auction, Reschke was asked to provide evidence of Primestone's financial ability to purchase the Units. Reschke produced a photocopy of the April 22 MOU, which he claimed gave Primestone a firm commitment of $105 million from Cadim. This "commitment" is the same MOU that had been superseded by the August 30 Amended MOU, which in turn expired by its own terms on September 29, 2001. Vornado notified Reschke that the MOU was not a

---

**18.** The representative from the Blackstone Group participated by telephone.

firm financing commitment and that Primestone, therefore, was not qualified to bid.

The auctioneer then read a description of the Units and began the auction. After he failed to attract any other bids, Vornado opened the bidding at $8.35 per Unit, which was the closing price of PGE's shares on the day of the foreclosure sale. No further bids were made. The Units were thus sold to Vornado for an aggregate price of $66,339,856.55.

## I. The Deficiency

Primestone was indebted to Vornado on April 30, 2002 for $116,111,323. The indebtedness on the Vornado Loan included the $62,000,000 principal, an exit fee of $2,102,240 and accrued interest at an annual rate of 16% before maturity and 20% after maturity. All overdue amounts, including principal, interest, fees and reimbursable expenses, are subject to the 20% interest rate when an Event of Default has occurred. The Vornado Loan Agreement also requires Primestone to pay "all out-of-pocket costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement" and related agreements.[19] As of April 30, Vornado had spent $2,499,573 in enforcing its rights under the Vornado Loan Agreement. Indebtedness on the Vornado Loan was reduced by $1,040,873 previously received pursuant to Vornado's security interest.

Primestone's indebtedness on the Prudential Loan includes the unpaid principal (net of cash received by Prudential pursuant to its security interest), late fees and accrued interest at the LIBOR rate plus 1.5% until maturity and LIBOR plus 7.5% after maturity. The result is remaining indebtedness under the Prudential Loan to

Vornado by Primestone in the amount of $40,848,356. Thus after including the proceeds from the foreclosure sale, Primestone still remains indebted to Vornado for the net amount of $49,771,467.

## III.

Vornado commenced this action on November 19, 2001. The action was stayed on the same day as a result of Primestone's filing of a bankruptcy petition. The stay remained in effect until the Bankruptcy Court dismissed Primestone's bankruptcy petition for bad faith on December 19, 2001. During the periods from January 4 through February 5 and February 15 through April 17, 2002, stays were reinstated pending appeal by the United States District Court and the United States Court of Appeals.

On December 20, 2001, Primestone and its affiliates amended their complaint in an action pending in Illinois to assert claims against Vornado, Vornado Realty Trust and Vornado Realty L.P. Accompanying this amended complaint was an application for a temporary restraining order to prevent Vornado from conducting the rescheduled foreclosure auction. Vornado then requested that this court prevent Primestone and its affiliates from interfering with the foreclosure sale through proceedings in other courts. On December 20, this court granted the request and issued a temporary restraining order.

On February 13, 2002, Primestone counterclaimed against Vornado and its affiliates in this court. Primestone also filed a motion for a preliminary injunction against the foreclosure sale then scheduled for February 25. After the Court of Appeals granted Primestone's motion for a stay pending appeal on February 15, however, Primestone declined to proceed in this

---

19. Silverstein Aff. Ex. 1 at § 9(c).

court with its motion for a preliminary injunction.

After the stay pending appeal terminated on April 17, 2002, Primestone again tried to pursue its motion for a preliminary injunction on the ground that Vornado was not conducting a commercially reasonable foreclosure. When this court indicated that Primestone would have to post a substantial bond as a condition of any grant of injunction, Primestone chose to withdraw its motion for a preliminary injunction. Primestone subsequently filed an amended counterclaim on August 19, 2002.

Vornado currently seeks a judicial determination that it is entitled to enforce the terms of its loan agreements. Vornado also seeks a declaration that its foreclosure auction was conducted in a commercially reasonably manner, and that it was the winner of the auction. Finally, Vornado seeks summary judgment on all 14 of Primestone's counterclaims.

Primestone's first amended counterclaim seeks a declaration that it won the foreclosure auction. Count II alleges tortious interference with a prospective contract between PGE and Bank One as well as tortious interference with various relations between Cadim and Primestone. Count III alleges fraud in the inducement based on alleged representations Vornado made prior to execution of the Vornado loan. Count IV alleges fraud based on Vornado's consent to the extension of the Prudential Loans. Count V alleges fraud based on misrepresentations during the term of the Vornado Loan. Count VI alleges a breach of the Prudential Loan by Vornado when it accelerated payments. Count VII alleges a breach of the Vornado Loan. Count VIII alleges a breach of the Intercreditor Agreement. Count IX alleges a breach of the implied contractual obligation of good faith and fair dealing. Count X alleges promissory estoppel based on statements made by Vornado prior to the execution of the Vornado Loan. Count XI alleges a breach of fiduciary duty by Vornado. Count XII seeks a constructive trust, but does not allege any misconduct giving rise to such relief. Count XIII seeks a declaration that the foreclosure sale was commercially unreasonable. Count XIV alleges that Vornado failed to comply with Revised Article 9 of the New York U.C.C.

## IV.

The legal standards for summary judgment are well settled.[20] Pursuant to Court of Chancery Rule 56, summary judgment should be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[21] When considering a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party, and the moving party has the burden of demonstrating that no material question of fact exists.[22] "When a moving party has properly supported its motion, however, the non-moving party must submit admissible evidence sufficient to generate a factual issue for trial or suffer an adverse judgment."[23]

---

**20.** To the extent Vornado relies on facts outside the pleadings, this court will apply a summary judgment standard. To the extent Vornado seeks to dismiss counterclaims strictly based on the pleadings, Chancery Court Rule 12(b)(6) standards will be applied.

**21.** *See Williams v. Geier,* 671 A.2d 1368, 1375 (Del.1996).

**22.** *See Tanzer v. Int'l General Indus., Inc.,* 402 A.2d 382, 385 (Del.Ch.1979) (citing *Judah v. Delaware Trust Co.,* 378 A.2d 624, 632 (Del. 1977)).

**23.** *Id.;* Ch. Ct. R. 56(e).

## V.

### A. *Vornado Is Entitled To The Enforcement Of Its Loans*

 There is no dispute that Vornado loaned $62 million to Primestone pursuant to the Vornado Loan Agreement or that Vornado acquired a loan of $40 million that Primestone owed to Prudential under the Prudential Loan Agreement.[24] Primestone failed to make required payments on either Loan when they came due. Primestone argues that an Event of Default did not occur, however, because "the Vornado Loan was, in effect, extended until November 30, 2001 by virtue of the Prudential Loan extension.[25] This challenge is without merit.

As part of the extension of the Prudential Loan, Vornado's consent was required. Vornado gave such a consent, but Vornado explicitly reserved its own rights under the Vornado Loan Agreement:

> The Borrower acknowledges and agrees that the Loan Agreement and other Credit Documents *remain in full force and effect*. The Borrower also acknowledges and agrees that *Vornado has not waived, and shall not be deemed to have waived,* any current or future Default or Events of Default under the Loan Agreement. . . . [26]

According to Primestone, "Primestone reasonably believed that Vornado could not claim a default until November 30, 2001" because Section 3(a) of the Intercreditor Agreement prevented Vornado from accepting repayment on its Loan until repayment was made on the Prudential Loan.[27] Any assertion of Primestone's rights under this Section of the Intercreditor Agreement, however, is foreclosed by Section 15 of the Agreement. Section 15 explicitly provides that the Agreement "is solely for the benefit of the Lenders and no other person or entity shall be entitled to rely on" it.[28] Primestone accepted this provision by signing the Agreement.

Primestone counters by arguing that it does have certain enforceable rights under the Intercreditor Agreement. This may be true, but those rights are not enforceable against Vornado or Prudential. None of the sections Primestone cites in the

---

24. With the exception of the SSAs (which are explicitly governed by Illinois law), New York law applies to all of Vornado's claims and all of Primestone's counterclaims. The contract claims related to the Prudential Loan are subject to New York law because Primestone agreed that New York law would apply in Section 9.11 of the Prudential Loan Agreement. All the other claims are also subject to New York law because the parties chose New York law to govern certain contracts, the collateral was located in New York, and New York was the situs of most of the alleged acts on which Primestone's claims are based. Accordingly, New York is the state with the most significant relationship to these claims and counterclaims. *See, e.g., IM2 Merchandising & Mfg., Inc. v. Tirex Corp.*, 2000 WL 1664168, at *10 n. 49 (Del.Ch. Nov.2, 2000) ("Because the parties explicitly contracted under the laws of Quebec, Canada and all the relevant events transpired in Quebec, Canada, the most significant relationship test suggests that the laws of Quebec, Canada govern the plaintiffs [sic] tort and contract claims").

25. Pl. Amend. Countercl. at 36.

26. Silverstein Aff. Ex. 5 at 1 (emphasis added). In addition, the Vornado Loan Agreement could not have been modified by Vornado's consent agreement. Section 17(n) of the Vornado Loan Agreement provides that "[t]his Agreement may not be modified or amended except by a written agreement signed by the parties." Silverstein Aff. Ex. 1 at 65. Vornado's consent is only between Primestone and Vornado. It does not involve the Guarantors (who must be a signatory to any amendment) and therefore does not amend the Vornado Loan Agreement.

27. Pl. Br. at 83.

28. Silverstein Aff. Ex. 3.

Intercreditor Agreement–Sections 2(b)(ii)(A), 2(c)(ii), 3(g) and 19–creates any rights that Primestone could enforce against either Prudential or Vornado.

■ This court is bound to give effect to the unambiguous language of Section 15.[29] Under New York law, a contract that declares it is "for the sole and exclusive benefit of the named parties" cannot be enforced or relied upon by a third party.[30] The Intercreditor Agreement was such a contract. Primestone is a third party to the contract. Thus, Primestone cannot enforce or rely upon it.

Primestone's failure to pay the Vornado Loan at maturity amounted to an Event of Default under the Vornado Loan without any demand or other action by Vornado. Further, Section 8.01(s) of the Prudential Credit Agreement provided that any default under the Vornado Loan Agreement constituted an Event of Default under the Prudential Loan Agreement. Finally, Section 8.02 of the Prudential Credit Agreement allowed Prudential to accelerate its loan upon an Event of Default specified in Section 8.01(s). This is essentially what Prudential did.

The sections of the Intercreditor Agreement that Primestone relies upon did not suspend or waive Events of Default under either Loan. Section 3(g) of the Vornado Loan Agreement titled "Exercise of Reme-dies" states that, "so long as any Senior Indebtedness is outstanding, [Vornado] . . . shall not exercise any rights or remedies with respect to an Event of Default under" the Vornado Loan Agreement.[31] The Agreement only prohibits Vornado from exercising its remedies when an Event of Default occurs. It does not prevent an actual Event of Default from occurring. Instead, because an Event of Default occurred under the Vornado Loan Agreement, it also constituted an Event of Default under the Prudential Credit Agreement, and Prudential had the right to exercise remedies against Primestone following such an Event of Default.

Section 5 of the Amendment to the Prudential Credit Agreement contemplates that Primestone might pay the Vornado Loan before the Prudential Loan. This Section amended the definition of "Expiration Date" in the Prudential Credit Agreement as follows:

"Expiration Date" means *the earlier of* (i) the repayment of the Vornado Loan, (ii) November 30, 2001, or (iii) the date on which a Change of Control of any of the Borrower, any Guarantor, Prime, or the REIT has occurred.[32]

Clause (i) of Section 5 explicitly identifies the possibility that Primestone might pay the Vornado Loan before November 30, 2001. If the Vornado Loan was not due

---

29. The court finds there is no ambiguity that Primestone was intended to be excluded from enforcing any part of the Intercreditor Agreement because Primestone is defined in Section 15 as a non-party. Section 15 proceeds to state that: "The parties hereto specifically reserve any and all of their respective rights, security interests, and rights to assert security interest as against the Company [i.e., Primestone] and any third parties." Silverstein Aff. Ex. 3 § 15; *see also id.* § 1 (defining Primestone Investment Partners L.P. as "the Company").

30. *A.H.A. Gen. Constr., Inc. v. Edelman P'ship*, 291 A.D.2d 239, 737 N.Y.S.2d 85, 86 (2002); *Howard Sav. Bank v. Lefcon P'ship*, 209 A.D.2d 473, 618 N.Y.S.2d 910, 914 (1994) (dismissing third party's breach of contract claim where "the agreement specifically provides that, '[a]ll conditions to the obligations of Bank to make Advances hereunder are imposed solely and exclusively for the benefit of Bank'" (citations omitted)).

31. Silverstein Aff. Ex. 3 at 11–12.

32. Silverstein Aff. Ex. 4 at 5 (emphasis added).

until November 30, as Primestone alleges, clause (i) would not have been needed.

There is simply no basis to conclude that either the Vornado Loan or the Prudential Loan were absolutely extended to November 30. The amendment to the Prudential Credit Agreement and Vornado's consent to the amendment essentially extended the Prudential Loan to October 25, 2001 unless Primestone obtained an extension of the Vornado Loan. Vornado did not extend the Vornado Loan, and as a result, both Loans were due on October 25.

An alternative allegation by Primestone is that it "reasonably relied upon Vornado's consent and the Intercreditor Agreement to conclude, to [its] detriment, that the expiration date of the Vornado Loan had also been extended until November 30, 2001." [33] The undisputed facts, however, appear to contradict such an allegation. Primestone appeared to understand that Vornado had not extended its Loan. On September 26, the day after the amendment to the Prudential Credit Agreement was executed, Primestone wrote to assure Vornado that it "intend[ed] to comply with the terms of the Loan Agreement." [34] On October 10, Primestone provided a letter to Vornado that stated:

> The Prime Group, Inc. ("Prime") currently owns 8,322,990 common shares and convertible partnership units in Prime Group Realty Trust (N.Y.SE:PGE), which represents a 31.2% interest in PGE on a fully-diluted basis (the "Control Block"). Prime is seeking an institutional investor (the "Investor") to purchase a 50% interest in this Control Block, *the proceeds of which will be used by Prime to retire approximately $66.0 million of indebtedness maturing on October 25, 2001, that is secured by a pledge of the Control Block that is subordinate to a $40.0 million margin loan.*" [35]

Primestone's repeated requests for an extension provide further evidence that Primestone understood that the Vornado Loan had not been extended. Fascitelli testified that after September 11, Reschke asked for an extension of the Vornado Loan "[e]very time he talked to me." [36] Fascitelli further stated: "We told him consistently that we would not extend it unless we got a pay down." [37] For all these reasons, the court finds that there are no genuine issues of material fact related to the extension of the Vornado Loan, and summary judgment will be granted as to Counts V through IX of Vornado's amended complaint. Furthermore, by Primestone's own admission, granting summary judgment on this issue in favor of Vornado necessarily negates Counts IV, VI, VII, VIII, IX, and XIV of Primestone's counterclaim. Therefore the court will grant summary judgment in favor of Vornado on those counterclaims.

B. *Vornado's Foreclosure Auction Was Conducted In A Commercially Reasonable Manner*

■ Under New York law, a "secured party seeking a deficiency judgment from the debtor after sale of the collateral bears the burden of showing that the sale was made in a 'commercially reasonable' manner." [38] Moreover, even when confronted

---

33. Pl. Amend. Countercl. at 48.

34. Silverstein Aff. Ex. 6.

35. Silverstein Aff. Ex. 7 (emphasis added).

36. Fascitelli Dep. at 37.

37. *Id.*

38. *Federal Deposit Insur. Corp. v. Forte,* 144 A.D.2d 627, 535 N.Y.S.2d 75, 77 (1988) (citations omitted).

with a "very close question of whether defendants have raised a question of fact" regarding commercial reasonableness, courts have followed the "rule that summary judgment should be denied" whenever "there is doubt as to the existence of a triable issue or when the issue is arguable." [39] This stringent standard, however, has not precluded courts applying New York law from granting summary judgment when they found there was no genuine issue of material fact regarding the commercial reasonableness of a foreclosure sale.[40]

Primestone complains the foreclosure auction was not performed in a commercially reasonable manner. New York U.C.C. Section 9–627 establishes guidelines for the determination of commercial reasonableness. Under subsection (a), the fact that a greater amount of money could have been "obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not itself sufficient" to establish that the disposition was not made in a commercially reasonable manner. Subsection (b) provides that a "disposition of collateral is made in a commercially reasonable manner if the disposition is made ... (2) at the price current in any recognized market at the time of disposition."

Primestone's first objection to Vornado's foreclosure auction was Vornado's belief that the Units needed to be sold at a public auction in order for it to make a bid for the Units. Although, such a requirement exists,[41] Primestone argues that Vornado should have sought a private sale anyway because the New York U.C.C. generally "encourages private dispositions on the assumption that they frequently will result in higher realization on collateral for the benefit of all concerned." [42] Such a generalized policy must give way in this circumstance, however, because there can be little doubt that Vornado was one of the most interested and able potential purchasers of the Units. By conducting a private sale, and thus eliminating Vornado as a potential purchaser, the price for the Units had the potential to be much lower than the ultimate selling price.

Primestone also argues that the price attained for the Units was unreasonably low. At the auction, the Units sold at a price equivalent to the closing price of PGE shares on the New York Stock Exchange on the date of the foreclosure sale. Primestone admits that the Units were the economic equivalent of PGE shares. Their value, therefore, should be considered roughly equivalent to the PGE share price on that day.[43] In fact, there can be little doubt that the Units' value was less than

---

**39.** *First Bank & Trust Co. of Ithaca v. Mitchell,* 123 Misc.2d 386, 473 N.Y.S.2d 697, 702 (Sup.Ct.1984).

**40.** *See First Fed. Sav. & Loan Ass'n v. Romano,* 253 A.D.2d 363, 676 N.Y.S.2d 163, 164 (1998) (affirming grant of summary judgment finding a sale of collateral that represented 81% of its fair market value raised no genuine issues of material fact about the commercial reasonableness of the sale).

**41.** *See* N.Y. U.C.C. § 9–610(c) provides that "a secured party may purchase collateral: (1) at a public disposition; or (2) at a private disposition only if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations".

**42.** NY U.C.C. § 9–610 Official Comment 2.

**43.** There is no requirement that actual market value for assets sold in foreclosure must be obtained. New York courts have "held that bids ranging from as low as 30% ... of market value are not commercially unreasonable." *First Fed. Sav. & Loan Ass'n v. Romano,* 676 N.Y.S.2d at 164.

the value of PGE's publicly traded shares. Although the Units were the economic equivalent of PGE shares, they lacked significant voting rights. The Units only represented limited partnership interests and could not participate in the management of the partnership.[44] PGE was still the General Partner of PGRLP. Thus, to obtain control of the PGRLP, one must obtain control of PGE. Absent a 9.9% Waiver, however, it was impossible to attain control of PGE. There is absolutely no indication such a waiver would have been given.

Primestone argues the Net Asset Value ("NAV") of the Units was $15 per Unit, which provides further evidence of the unreasonable price obtained in the auction. This argument is unpersuasive. NAV could only be realized, if at all, in a sale or disposition of PGRLP. There is no indication of any plans to liquidate PGRLP's assets or that the real estate in PGRLP's portfolio is easily liquidated. That is the reason market price in this case could diverge significantly from NAV.

■■ It is also the case that the procedures employed by Vornado were reasonable. Goldman Sachs was hired to do the marketing, and the efforts undertaken by Goldman Sachs were "consistent in all material respects with actions it has taken in the past in connection with other marketing processes relating to real estate-related companies and equity interests there-

in."[45] The only major flaw in the auction was the fact that only Vornado was privy to inside information relating to PGE. Primestone could certainly have chosen to provide such inside information to potential purchasers, yet it refused to do so. Vornado possessed some inside information, but it had no sense of how reliable it actually was. It also had no way to obtain any additional inside information.

For all these reasons, Vornado is entitled to a declaration that the foreclosure sale was conducted in a commercially reasonable manner, and Count XIII of the counterclaim will be dismissed.

■■. Primestone did not win the auction and Count I of the counterclaim will be dismissed as well. Primestone was properly disqualified from bidding at the foreclosure sale because it could not produce a valid financing commitment. In its brief in opposition to summary judgment, Primestone did not attempt to defend this claim. Therefore, Primestone should be deemed to have waived it. Since, Primestone could not bid at the auction, and Vornado was the highest bidder, Vornado will be declared the winner of the auction.

### C. Primestone's Tortious Interference Counterclaims Must Be Dismissed

■■ Under New York law, a claim of tortious interference with contractual rela-

---

**44.** Section 7.1 of PGRLP's partnership agreement demonstrates that PGE had complete control over the operations of the partnership:

> Except as otherwise expressly provided in this Agreement, or as required by applicable law, all management powers over the business and affairs of the partnership are fully, exclusively and completely vested in the Managing General Partner, and no other Partner shall have any right to transact business for, participate in the management or decisions of, or exercise control or management power over the business and affairs of, the Partnership.

Furthermore, Section 7.3 provides that limited partners have no voice in the selection of the Managing General Partner: "The Managing General Partner may not be removed by the other Partners with or without cause, except with the consent of the Managing General Partner." Thus, without assurance that a potential purchaser of the Units would be granted a 9.9% Waiver, it is impossible to assume that the Units sold at the foreclosure auction amounted to a control block.

**45.** Rosenberg Aff. ¶ 32.

tions consists of four elements: "(1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff." [46]

1. *Primestone Concedes That Vornado Did Not Tortiously Interfere With PGE's Prospective Contractual Relations With Bank One*

Primestone's deposition of Jamie Dimon, the CEO of Bank One, has conclusively refuted Primestone's allegation that on "information and belief" Vornado caused Bank One to terminate discussions with PGE over the sale of the Dearborn Center.[47] Presumably for this reason, Primestone has abandoned this counterclaim.[48] The court will therefore dismiss Count II of Primestone's amended counterclaim to the extent that it alleges tortious interference with Bank One.

2. *Vornado Did Not Tortiously Interfere With The SSAs*

■ Another aspect of Primestone's tortious interference claim relates to the "sole use" provisions in the confidentiality clauses of the SSAs entered into by Cadim. Although four separate SSAs were executed, only SSA No. 2 and SSA No. 4 are relevant to this litigation. These are the "Amended and Restated" versions of the other two SSAs.[49] Under Illinois law, which controls all of these agreements, each Amended and Restated agreement superseded the original because it dealt with identical subject matter.[50] Thus, there are only two SSAs that could be the subject of a tortious interference claim.[51]

■ Vornado could not have induced Cadim to breach the sole use clause in SSA No. 2 because PGE expressly waived that provision to permit Cadim to have discussions with Vornado. The only Evaluation Materials referred to in SSA No. 2 come from PGE, and not Primestone or its affiliates.[52] On November 16, 2001, PGE executed a Consent and Agreement that permitted Cadim to enter into discussions with Vornado despite the terms of SSA No. 2. The Consent and Agreement states:

4. *Confidentiality Agreement and SSA.* . . . the REIT and the Partnership hereby acknowledge and agree (i) that the Cadim entities may engage in discussions with, or may at some point

**46.** *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 595 N.Y.S.2d 931, 934, 612 N.E.2d 289 (1993) (citations omitted).

**47.** *See* Dimon Dep. at 56–64.

**48.** *See* Def. Br. at 74 n. 40 ("The amended counterclaim also alleges that Vornado wrongfully interfered with Primestone's and its affiliates' reasonably anticipated arrangement with Bank One in connection with the sale of the Dearborn Center. Primestone at this time will not rely upon those allegations").

**49.** The four SSAs are summarized by the following table:

**50.** *See Dolezal v. Plastic & Reconstructive Surgery, S.C.*, 266 Ill.App.3d 1070, 204 Ill.Dec.

10, 640 N.E.2d 1359, 1366 (1994) ("A complete, valid, written contract merges and supersedes all prior and contemporaneous negotiations and agreements dealing with the same subject matter") (quotation omitted). The only difference in the superseding versions of the SSAs are the dates.

**51.** Vornado could not have interfered with SSA No. 1 or SSA No. 3 before the dates in which they were superseded (September 14 and August 30, 2001, respectively) because it is undisputed that the first contact between Vornado and Cadim occurred on October 18, 2001. Pl. Br. at 18.

**52.** *See* Pl. Supp. Br. Ex. D § 2.

entertain the possibility of a joint proposal together with, Vornado Realty Trust (or Vornado Realty Trust and one or more of its control affiliates), regarding a possible strategic transaction involving the Partnership and the REIT....

■ Primestone is further precluded from asserting tortious interference with respect to SSA No. 2 because it has failed to adequately establish that Vornado was the proximate cause of Cadim's breach of contract.[53] To prevail on its claim, Primestone must show "there would not have been a breach but for the activities of [Vornado]."[54]

■ Evidence that the third party *intended to breach its contract will defeat an* action for tortious interference with contractual relations. In *Huggins v. Povitch*,[55] the plaintiff's tortious interference claims were dismissed because the record clearly demonstrated that the third party at whom the tortious conduct was allegedly directed "needed no inducement from defendant to breach the confidentiality agreement."[56] Similarly, in *John Paul Mitchell Systems*, the court dismissed the plaintiff's claims where, as in *Huggins*, the third party "needed virtually no inducement to [breach the sales contract]".[57] Although "[the defendant] was certainly a willing buyer," its actions were not deemed the proximate cause of the breach of contract.[58]

The facts of this litigation are highly analogous to those of the cases above. Primestone admits that by October 19, there was "no doubt about Cadim's plan to abandon its promise to use the information concerning PGE Realty solely to do a deal with the Private Prime Parties."[59] Primestone does not allege any interference by Vornado through this date. Nor does it dispute that the first discussion between Vornado and Cadim about the possibility of doing a transaction together did not occur until October 29. Thus, even if Primestone's allegations could be proven, they would demonstrate, at most, that Vornado was simply a "willing seller," and that Cadim needed no inducement from Vornado to allegedly breach its confidentiality obligations with respect to SSA No. 2.

■ Primestone also failed to establish that Vornado tortiously interfered with SSA No. 4 because Primestone "release[d] Cadim from the *confidentiality obligations* with respect to the Evaluation Material" in the October 10 letter Reschke sent to Cadim, more than a week before Vornado's first contact with Cadim.[60] Primestone attempts to defend this claim by arguing that the October 10 letter did not apply to the "sole use" subsection of the section entitled "Confidentiality" in SSA No. 4. The court cannot accept such an interpretation of the October 10 letter and SSA No. 4.

---

**53.** *See John Paul Mitchell Sys. v. Quality King Distribs., Inc.*, 106 F.Supp.2d 462, 477 (S.D.N.Y.2000) ("In a tortious interference action, the plaintiff must show that the tortfeasor's actions were the proximate cause of the breach of contract") (quotation omitted).

**54.** *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir.1990) (quotation omitted).

**55.** 1996 WL 515498 (N.Y.Sup.Ct. Apr. 19, 1996).

**56.** *Id.* at *9.

**57.** *John Paul Mitchell Sys.*, 106 F.Supp.2d at 477.

**58.** *Id.*

**59.** Pl. Br. at 20.

**60.** Silverstein Aff. Ex. 15 (emphasis added).

The "sole use" provisions is merely the second clause of the confidentiality provision in SSA No. 4:

> 2. *Confidentiality.* Cadim agrees that (a) all information regarding Residential Newco and the PGI Parties furnished to Cadim, whether prior to or after the date of this Agreement, in connection with Cadim's consideration of the Proposed Transaction (the *"Evaluation Materials"*) will be kept strictly confidential, and (b) the Evaluation Material will be used solely for the purpose of determining the desirability of the Proposed Transaction.... [61]

Notably, the October 10 letter uses the plural term "confidentiality obligations," recognizing that there is more than one confidentiality obligation. Thus, the unambiguous language of the October 10 letter and SSA No. 4 precludes Primestone's allegation that the October 10 letter did not waive the "sole use" provision. For these reasons, the court will dismiss Count II of Primestone's amended counterclaim to the extent it alleges tortious interference with any of the SSAs.

### 3. *Primestone Did Not Tortiously Interfere With Primestone's Prospective Contractual Relationship With Cadim*

 Under New York law, the elements of a claim for tortious interference with prospective business relationships are: "(1) [the prospects of] business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship." [62] In other words, Primestone must demonstrate "wrongful means" directed at the prospective contract,[63] and that "but for the defendant's wrongful conduct," the plaintiff would have entered into a contract with the third party.[64]

Primestone cannot dispute that: (1) the Amended MOU was terminated by a letter agreement dated October 10, 2001; (2) Cadim terminated all discussions with Primestone by October 20 at the latest; and (3) the only contact between Vornado and Cadim before October 20 consisted of a single telephone call initiated by Cadim on October 18, 2001, in which Vornado did not attempt to discourage Cadim from engaging in a potential transaction with Primestone.

Primestone argues that Vornado interfered with its business relations with Cadim before Primestone even began negations with Cadim. This was purportedly accomplished by Vornado "conceal[ing] its true intentions to prevent Primestone from refinancing the Vornado loans and to control and/or acquire PGE Realty." [65] This plan was allegedly accomplished by (1) "profess[ing] eagerness to invest in the Private Prime Parties and/or acquire PGE Realty"; and (2) bargaining for a "No Shop" provision in the Vornado Loan Agreement.[66] All of these allegations,

---

**61.** Pl. Supp. Br. Ex. A § 2.

**62.** *Nadel v. Play–by–Play Toys and Novelties,* 208 F.3d 368, 382 (2d Cir.2000) (citations omitted) (applying New York law).

**63.** *NBT Bancorp, Inc. v. Fleet/Norstar Fin. Group, Inc.,* 87 N.Y.2d 614, 641 N.Y.S.2d 581, 664 N.E.2d 492, 497 (1996).

**64.** *Vigoda v. DCA Prods. Plus, Inc.,* 293 A.D.2d 265, 741 N.Y.S.2d 20, 23 (2002).

**65.** Def. Br. at 81.

**66.** *Id.* at 81–82. The "No Shop" clause prohibited Primestone from discussing or soliciting refinancing of the Vornado Loan without the written consent of Vornado.

however, involve events that occurred before the Vornado Loan Agreement, which was executed in September 2000. Further the allegations have almost no connection to Cadim, which did not begin negotiations with PGE until the summer of 2001. Interestingly, Cadim is never even referenced in Primestone's three-page discussion of Vornado's alleged tortious interference with a prospective relationship between Cadim and Primestone.[67]

 Primestone has failed to explain how any of this alleged conduct was *intentionally* directed at any potential business relationship with Cadim. Primestone has failed to show business relations with Cadim or Vornado's interference with *those* business relations. Because Primestone cannot show that any of Vornado's alleged acts were directed at Primestone's relationship with Cadim, Primestone cannot possibly demonstrate that it would have entered into a contract with Cadim "but for" such conduct.[68] Dansereau's testimony, on the other hand, makes clear that Cadim's choice to not engage in a transaction with Primestone had nothing to do with Vornado:

Q. Were you still trying to do a deal with PGI when you called Mr. Fascitelli?

A. No, no, we were not.

\* \* \*

Q. Why not?

A. One, we could not support the structure that was contemplated in the MOU and therefore short of revisiting the deal entirely, it was virtually

impossible for us to do the deal and maintain the private REIT structure which is fundamental in our transaction.

In addition, we lost faith in Mr. Reschke's ability to, even on a restructured basis, participate in a transaction with Cadim.[69]

Thus, the undisputed facts show that Cadim had abandoned discussions PGE and its affiliates for reasons of its own. Because there is no evidence that Vornado intentionally interfered with any relationship between Cadim and PGE and its affiliates, the court will dismiss Count II of the amended counterclaim to the extent it alleges tortious interference with prospective business relations.

D. *Primestone's Fraud In The Inducement, Promissory Estoppel And Fraud Counterclaims Must Be Dismissed*

 Count III of Primestone's amended counterclaim attempts to state a claim for fraud against Vornado by inducing Primestone to enter into the Vornado Loan Agreement. This was allegedly done by Vornado's indication that it would continue to negotiate an equity investment with PGE or the Private Prime Parties. This argument fails as a matter of law, however, because Section 17(h) of the Vornado Loan Agreement contained an integration clause that provided that the Agreement "supersede[s] all prior agreements and understanding, both written

---

67. *See* Def. Br. at 81–83.

68. *Vigoda,* 741 N.Y.S.2d at 23.

69. Dansereau Dep. at 147–48. In addition, Dansereau *testified that due diligence had* raised a number of disturbing issues: (1) PGI would not hold enough equity after the deal, which was important because Canadian tax laws only permitted Cadim to hold a 50% equity stake in the new company; (2) PGE's failure to sell the Dearborn Center to Bank One concerned Cadim; and (3) Reschke had not, in Cadim's mind, adequately represented the true status of several important deals that PGE was engaged in.

and oral, among the parties...."[70] Thus, any alleged promise by Vornado that pre-dated and related to the Vornado Loan Agreement is not actionable. In addition, Primestone has released any possible claims against Vornado. This is due to the October 8, 2001 letter, wherein Vornado consented to the extension of the Pruden-tial Loan and received a release of liability in return for such consent.[71] Finally, mere statements of future intent (as is the case here), without more, are not sufficient to establish fraud.[72] For all these reasons, the court will dismiss Count III of Prime-stone's amended counterclaim.

▮▮▮▮ For similar reasons, Count X of Primestone's amended counterclaim, which alleges promissory estoppel related to statements made before the Vornado Loan was executed, must fail. "The ele-ments of promissory estoppel are clear: a clear and unambiguous promise; a reason-able and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance."[73] There is no need to analyze the actual merits of Primestone's claim, however, be-cause any acts or omissions on Vornado's part before the execution of the October 8 letter are not actionable for the reasons already discussed. Accordingly the court will dismiss Count X of Primestone's amended counterclaim.

▮▮ Count V of Primestone's amended counterclaim is a claim of fraud based on alleged (but unidentified) statements by Vornado during the life of the Loan relat-ed to its intent to enter into an equity investment with PGE or the Private Prime Parties. This claim must fail for two rea-sons. First, the claim is contradicted by Primestone's own allegation that "after the Vornado Loan was made, Vornado Realty refused to proceed with either an equity investment in the Private Prime Parties or an acquisition of PGE."[74] Second, Prime-stone does not allege that any of these statements were made after the October 8 Vornado consent. Accordingly, even if Vornado had made certain statements be-fore this point, they are not actionable because Vornado had received a valid gen-eral release. Therefore, this court will dismiss Count V of Primestone's amended counterclaim.

### E. Primestone's Breach Of Fiduciary Duty Counterclaim Must Be Dismissed

Count XI of Primestone's amended counterclaim seeks to state a claim against Vornado for breaches of fiduciary duties owed to Vornado. As a threshold matter, however, Primestone must allege that it was a party to whom a duty was owed by Vornado. It has failed to do so.

---

**70.** Silverstein Aff. Ex. 1 at 61.

**71.** See note 3, supra. Primestone argues that the consent was procured by fraud and is thus unenforceable. See Liling v. Segal, 220 A.D.2d 724, 633 N.Y.S.2d 199, 200 (1995) ("A party seeking to set aside a release on the ground of fraud bears the burden of establish-ing a material misrepresentation of fact, made with knowledge of its falsity, with intent to deceive, justifiable reliance and damages") (quotation omitted). Primestone, however, has failed to allege with any specificity fraud related to the consent.

**72.** See Orix Credit Alliance, Inc. v. R.E. Hable Co., 256 A.D.2d 114, 682 N.Y.S.2d 160, 161 (1998) (holding that "a viable claim of fraud concerning a contract must allege misrepre-sentations of present facts ... rather than merely of future intent").

**73.** Ripple's of Clearview, Inc. v. LeHavre As-socs., 88 A.D.2d 120, 452 N.Y.S.2d 447, 449 (1982).

**74.** Def. Amend. Countercl. at 14–15.

 Primestone does not dispute that under New York law "no fiduciary duty aris[es] out of the contractual arms' length debtor and creditor relationship" between a borrower and a lender.[75] However, Primestone argues that by virtue of the amount of control Vornado exercised over it, such duties have been created.[76] To demonstrate this control, Primestone points out that Vornado was appointed to be Primestone's attorney-in-fact for purposes of protecting its interests in the collateral. However, this appointment amounts to no more than a power coupled with an interest. A power coupled with an interest is a power that "is held for the benefit of a person other than the power giver." [77] Because this power was not held for the benefit of the debtor, no fiduciary relationship results from its grant.[78] This provision was intended solely to protect Vornado's interest in the collateral.

Next, Primestone claims that "no shop" and "first offer" provisions in the Loans creates fiduciary duties owed by Vornado to Primestone. This is because the provisions made it hard to refinance the Loans. "No shop" and "first offer" terms in loans, however, have previously been approved by New York courts.[79] The "no shop" and "first offer" terms merely protect Vornado's economic interests. Furthermore, Primestone admits that neither the "no shop" nor the "first offer" provision actually prevented Primestone from refinancing.

Vornado simply did not exert enough control over Primestone's business, assets, and finances to demonstrate that this court should impose fiduciary obligations on Vornado in this instance. Therefore, the court will dismiss Count XI of Primestone's amended counterclaim.

### F. *Primestone Is Not Entitled To A Constructive Trust*

 Count XII of Primestone's amended counterclaim seeks the imposition of a constructive trust on the Units. For a court to impose a constructive trust, a plaintiff must demonstrate "(1) a confidential or fiduciary relationship, (2) a promise, (3) a transfer in reliance on such promise, and (4) unjust enrichment." [80] Primestone has not attempted to establish any of these elements. Vornado addressed this problem in its brief,[81] and Primestone failed to respond. Therefore this court will dismiss Count XII of Primestone's amended counterclaim.

### VI.

For the foregoing reasons, Vornado's motion for summary judgment as to Counts IV through IX of its amended complaint is **GRANTED**. Vornado's motion for summary judgment on Primestone's amended counterclaim is also **GRANTED**. **IT IS SO ORDERED.**

**75.** *FAB Indus., Inc. v. BNY Fin. Corp.*, 252 A.D.2d 367, 675 N.Y.S.2d 77, 78 (1998) (quotations omitted).

**76.** *See K.M.C. Co., Inc. v. Irving Trust Co.*, 757 F.2d 752, 759 (6th Cir.1985) (applying New York law).

**77.** Restatement (Second) Agency § 138 cmt. b (1958).

**78.** *See Louros v. Cyr*, 175 F.Supp.2d 497, 515–16 (S.D.N.Y.2001) (a power of attorney did not create a fiduciary relationship where the purpose of the power was to benefit the power holder); *See, e.g., Realty Growth Inv. v. Council of Unit Owners*, 453 A.2d 450, 455 & n. 5 (Del.1982).

**79.** *See 2 Broadway LLC v. Credit Suisse First Boston Mortgage Capital LLC*, 2001 WL 410074, at *2 (S.D.N.Y. Apr.23, 2001).

**80.** *Perry v. Perry*, 235 A.D.2d 817, 652 N.Y.S.2d 163, 164 (1997).

**81.** *See Pl. Br. at 45.*